BATES MACHINE COMPANY, DEFENDANT IN ERROR, v. THE TRENTON AND NEW BRUNSWICK RAILROAD COMPANY, PLAINTIFF IN ERROR.

THE PHOENIX IRON WORKS COMPANY, DEFENDANT IN ERROR, v. THE TRENTON AND NEW BRUNSWICK RAILROAD COMPANY, PLAINTIFF IN ERROR.

HENDERSON & BROTHER, DEFENDANTS IN ERROR, v. THE TRENTON AND NEW BRUNSWICK RAILROAD COMPANY, PLAINTIFF IN ERROR.

Argued March 3 and 4, 1904—Decided September 30, 1904.

1. The right to lien a building for materials furnished under our Mechanics' Lien act is not rendered unenforceable by the conveyance of the property to a corporation for railroad purposes.
2. The production and control of electric power by mechanical means and its adaptation for use upon a trolley system is a "manufacturing purpose" within the meaning of section 8 of the Mechanics' Lien law.
3. In the absence of conflicting claims between the person who actually performed the labor and the person who, under a contract, caused it to be performed upon a building, the latter is by our Mechanics' Lien law given a lien for the labor so furnished.
4. When a sub-contractor knows that a building contract under which he is proposing to accept employment provides that no sub-contractor shall file any lien, the mere acceptance of such employment will bar him from asserting a lien in opposition to such provision.

On error to the Mercer Circuit Court.

For the plaintiff in error, *William M. Lanning.*

For the defendant in error, *Norman Grey.*

The opinion of the court was delivered by

GARRISON, J. The three writs of error that have been argued together bring up records of judgments recovered in actions brought to enforce mechanics' liens.

In the case of the Bates Machine Company the claimant was a sub-contractor with the defendant Henry M. Sciple, the principal contract being between Sciple and a corporation called the Railroad Construction Company. This contract was dated April 5th, 1902, and was not filed. The defendant owner, the Trenton and New Brunswick Railroad Company, is the grantee of the Railroad Construction Company under a conveyance dated July 28th, 1902. Work under the contract and the furnishing of material by the plaintiff began prior to July 1st, 1902.

These dates effectually dispose of the first contention of the plaintiff in error, namely, that "no lien is given by our Mechanics' Lien act, either for labor performed or materials furnished for any building for a railroad company which is essential to the operation of that company's railroad." The argument made in support of this contention has been examined sufficiently to see that, irrespective of its soundness or unsoundness as an abstract proposition, it is not applicable to a case where the corporation in whose behalf it is invoked has become the owner of the property after the right to lien it for the performance of an entire contract had commenced to run, which is the situation here. The proposition that would be pertinent to the facts of the present case; namely, that a subsisting right of lien is rendered unenforceable by the conveyance of the property to a corporation for railroad purposes, has for obvious reasons not been advanced. *Edwards* v. *Derrickson,* 4 *Dutcher* 39; affirmed, 5 *Id.* 468.

The second assignment of error is that the machinery furnished by the claimant was not "for manufacturing purposes" and hence was not a building under section 8 of the Mechanics' Lien act. *Pamph. L.* 1898, *p.* 538. The machinery furnished by the claimant and set up in the power-house of the plaintiff in error consisted of engines, dynamos and other connected appliances for the production and control of electric power and its adaptation for use upon a trolley system. The contention of the plaintiff in error is that the entire clause, "fixed machinery, or gearing, or other fixtures for manufacturing purposes" is qualified by

the last three words, and hence that it covers only machinery that is used for manufacturing purposes, and that the production of electric power is not a "manufacturing purpose," because "the term 'manufacture' means to make something out of raw materials or out of prepared materials" and "electric power is not a material substance." I am inclined to agree to the statutory construction contended for, but I am unable either to give this restricted meaning to the words "for manufacturing purposes" in this context, or to assent to any conclusion that involves the idea that something that is elicited from its natural source by mechanical processes is not a material substance. The question, however, is not one of scientific terminology but rather of the sense in which an ordinary term was used by the legislature in framing an enactment whose sole purpose was to secure to laborers and others payment for furnishing and erecting machinery for manufacturing purposes, a descriptive term that should be given its broadest signification in order to effect what was clearly the legislative will. That the word "manufacture" is no longer limited to something that is made by hand is not more obvious than that, by the very necessities of the case, it must continue to travel farther and farther from its first meaning in keeping with the growth and progress of the thing for which it continues to stand; so that to make by machinery, or by chemical reaction, or by any other device known to art, has already entirely superseded the original notion of hand fabrication. While its original meaning lasted, however, it necessarily involved the idea of tangibility, but with the elimination of the manual element from the essential meaning of the word, there was no longer the slightest justification for the retention of this notion of tangibility as a restriction upon its broadening usefulness, and, as a fact, it has been entirely dropped from current use when applied to such processes as the manufacture of oxygen, or of carbonic acid, or of nitrous oxide, or of illuminating gas, or of a host of other products totally lacking in tangibility. The essential meaning retained by the word "manufacture," or perhaps that has been acquired by it, is that of effecting by art some change

in materials or elements as they exist in a state of nature by which they are rendered more subject to man's control or more serviceable to his use. A mere appropriation of natural objects without imparting to them this added quality, as in the case of agriculture or of the gathering of natural ice, is not manufacture in this current sense, nor is the mere liberation or collection of natural products, such as petroleum or natural gas. But the production of illuminating gas is a manufacture. *Nassau Gaslight Co.* v. *City of Brooklyn,* 89 *N. Y.* 409. So is the making of ice by artificial means. *People* v. *Knickerbocker Ice Co.,* 99 *Id.* 181.

Neither the fact, therefore, that the material elements to be acted upon already exist in a state of nature, nor the fact of their intangibility before or after the desired change has been impressed upon them, militates against the application of the word "manufacture" to the process by which such change is wrought. In the recent case of *People* v. *Wemple,* 129 *N. Y.* 543, decided in the New York Court of Appeals, the precise question we are now considering was before the court as a basis for exemption from taxation, to which, for obvious reasons, a much more stringent rule is applied than to remedial legislation, such as our Mechanics' Lien law. In the opinion in that case, Judge O'Brien said: "The true inquiry would seem to be whether the corporation would not be considered, in common language, as engaged in some manufacturing process. Though granting all that is said by experts and others about electricity as a natural element or force, to say that electricity exists in a state of nature, and that the relator collects or gathers it, does not fully or accurately express the process. According to the common understanding, the electricity or thing that produces the results is generated or produced by the application of power to machinery; that is, by a process purely artificial. Passing by the refinements of scientific discussion, it would seem to be common sense to hold that a corporation that does this is, in every just sense of the term, a manufacturing corporation. The materials from which all manufactured things originate

exist in a state of nature, but the manufacturer, by application to these materials of labor and skill gives to them a new and useful property. The electricity which is generated and transmitted by the operation of the relator is a very different thing from that mysterious element which is said to pervade nature."

Another recent case (*Commonwealth* v. *Northern Electric Light and Power Co.,* 145 *Pa.* 105) is cited in certain works of reference as holding the opposite of this view; but, on the contrary, while affirming the judgment of the court below, where such opposite view had been expressed, the reviewing court used this language: "The scientists whose views the learned judge adopted may be right or wrong; we have no need to decide this question. The laws are written, ordinarily, in the language of the people, and if this case depended on that question, we should be led to a different conclusion, and hold that the company was a manufacturing company."

In our own state, in the case of *In re Consolidated Electric Storage Co.,* 26 *Atl. Rep.* 983 (Bird, V. C.), it was said that the production of electricity was a manufacturing business; and in *Hughes* v. *Lambertville Electric Light Co.,* 8 *Dick. Ch. Rep.* 435, it was expressly held that wires and insulation for the transmission of electric power were subject to lien under the provisions of the very section of the Mechanics' Lien act that we are now considering. The opinion of Mr. Justice Depue, in *Evening Journal Association* v. *State Board of Assessors,* 18 *Vroom* 36, while not directly in point, is valuable for its reference to Dr. Brandes' definition of "manufacture." The exact language of the author referred to is: "The province of a manufacturer is to shape or modify materials with a view to the development of those powers and forces which they possess, and which are necessary, useful or convenient to mankind." *Brande & Cox Dictionary, art. "Manufacture."*

It is, furthermore, of marked significance that in other statutes the legislature of this state uses the word "manufacture" to mean the production of electric power, as, for instance, "manufacture of electricity for light, heat and

power." *Pamph. L.* 1892, *p.* 403; *Pamph. L.* 1894, *p.* 36.
We must conclude, therefore, that the words "manufacturing
purposes" have an accepted meaning that is broad enough
to cover the production by mechanical means of electric
power, and that they should be read in that sense in the
statute in question, provided the context is one that fairly
indicates that such was the meaning in which the legislature
employed them. Obviously, manufacturing may be regarded
by the legislature in a variety of aspects, and where its effect
upon the community at large is chiefly or solely considered,
the nature of the products of manufacture and their dis-
tribution would be a paramount consideration, and hence
give color to the sense in which the word should be deemed
to be employed. Hence there are decisions to be found in
which exemption from taxation has been denied to electric
light companies, upon the ground that they were not in-
cluded under the term "corporations carrying on manufac-
turing within the state" (12 *Am. & Eng. Encycl. L.* 266),
although in the cases cited from New York and Pennsylvania
even those considerations.have not been considered sufficient
to overcome the force of the word itself in the common
acceptation. Where, however, no such questions intervene
and the word is employed solely as descriptive of machinery
and used in a remedial statute, there is nothing to prevent,
and nothing should prevent, the court from giving to the
term "manufacture" the broadest meaning that it has ac-
quired in the language of common people in speaking gener-
ally of mechanical enterprises. Especially is this so when
such remedial legislation concerns the relation of debtor
and creditor with respect to mechanism, which, by a combi-
nation of labor and capital, produces a result that is to the
common mind, in this aspect, indistinguishable from ordi-
nary manufacturing operations. I have no difficulty in
reaching the conclusion that the language of the eighth sec-
tion of the Mechanics' Lien act is broad enough to cover the
materials furnished in the present case by the plaintiff to the
defendant for the production of electric power.

Independently of the section of the Mechanics' Lien law that we have been considering, it is highly probable that the materials which were placed by the plaintiff in the power-house of the defendant, as part of the means by which to carry out the purposes for which the building was adapted, were so annexed to it as to become, as between the plaintiff and defendant, part of the realty, under the case of *Feder* v. *Van Winkle,* 8 *Dick. Ch. Rep.* 370, and *Knickerbocker Trust Co.* v. *Penn Cordage Co.,* decided June 20th, 1904. The case, however, has not been argued in this aspect, and the testimony essential to its presentation, which appears only incidentally, is not sufficiently full to warrant us in making it the basis of a decision between these parties.

A third assignment of error gives rise to the contention that a sub-contractor "can have no lien for any labor furnished by its agents or employes," the argument being that the only lien given by the Mechanics' Lien act is "to the person who actually performs the labor, and to no one else," which is not the language or the purport of the statute. In the absence of conflicting claims between the person who actually performs the labor and the person who causes it to be performed, the latter is so clearly within the legislative language as to render any discussion of the matter unnecessary.

A fourth assignment of error is that "the trial court over-ruled evidence offered by the plaintiff in error to prove that the defendant in error, before entering into its contract with Henry M. Sciple, in the testimony referred to, had notice of the provision in the contract between the Railroad Construction Company and Henry M. Sciple that the said Henry M. Sciple did thereby agree to file no liens for any labor or material furnished under said contract, and that no sub-contractor for work or materials should have any right to file any lien for any sum which might be due or become due to such sub-contractor, and that any such right to file such lien was expressly waived."

The bill of exceptions upon which this assignment is based is as follows:

"*Q.* Do you know—have you any present knowledge as to whether the contract between the construction company and Sciple was received back from the Bates Machine Company?

"[Objected to.]

"The Court—I will permit that.

"*A.* Yes.

"*Q.* What present knowledge have you?

"[Objected to on the ground that it is immaterial.]

"Mr. Lanning—I purpose to show that this contract, before a contract was entered into between the Bates Machine Company and Sciple, was submitted to the Bates Machine Company; that they saw it; that they saw the provisions with reference to the waiver of liens, and having entered into this contract with actual notice of the provision on waiver in the main contract, they would be bound by it.

"The Court—My view is that such testimony would be immaterial. I cannot see how the Bates Machine Company can lose any of its rights by any provision put in the original contract, whether they knew it or not. I exclude the offer."

The contract between the construction company and Sciple contained the provision concerning liens set out in the assignment of error.

It is evident, therefore, that the ruling to which exception was sealed raises the question whether the Bates company may successfully assert its lien, if at the time it entered into its sub-contract with Sciple it knew that Sciple's contract with the owner contained a provision that no subcontractor should file a lien for any sum due him under his sub-contract—a question that apparently has not been judicially determined in this state. Elsewhere, notably in Pennsylvania, it has been held that the bare existence of such a provision in the building contract bars the liens of subcontractors and materialmen, whether they knew of it or not. 20 *Am. & Eng. Encycl. L.* 361.

This rule, which proceeds upon the theory that sub-contractors are *ipso facto* chargeable with knowledge of what is contained in the contract under which the building is erected,

has not been generally followed, and was expressly disavowed in the opinion delivered in our Supreme Court, in the case of *Brewing Company* v. *Donnelly,* 30 *Vroom* 48, where it was said: "The plaintiff in error was not injured unless the bare existence of the waiver of liens in an unfiled contract protects a building from liens. This, obviously, is not so. The right of lien given by the first section is fixed when materials are furnished, unless it is taken away by section 2. The right is personal and is vested unless personally waived."

That case, which was affirmed by this court upon the opinion just cited, did not, however, involve the question of notice.

In the reported case of *Brewing Company* v. *Clement,* 30 *Vroom* 48, 438, the Supreme Court and this court decided that a sub-contractor who, before the commencement of the building, had, as one of three sureties for the builder, executed to the owner a bond conditioned for the faithful performance of the builder's contract, and that he should keep the building free from the lien of any and all debts, was not thereby deprived of his own right to file a lien for the amount of materials afterwards furnished by him. This decision proceeded upon the idea that the plaintiff was not to be deprived of the right of contribution from his co-sureties on the bond merely because circuity of action would be avoided by holding that by indemnifying the owner against all liens the sub-contractor had barred his own right to lien. No other question was involved or considered, and as the decision did not travel outside the provisions of the bond, no question arose as to the provisions of the contract, or of the sub-contractor's knowledge respecting them, concerning which there was no testimony offered, no presumption of fact and no point made.

In other jurisdictions where the question has arisen contrary results have been reached. The cases are collected in 20 *Am. & Eng. Encycl. L.* 361 and 34 *Cent. Dig., col.* 2246 *et seq.*

An examination of these cases justifies the conclusion that the greater weight of authority is that a provision in a build-

ing contract against the assertion of liens by anyone will pre-vent a sub-contractor or materialman, who has notice of such provision, from asserting a lien for labor or materials furnished pursuant to such contract.

This rule, we think, rests in sound reason. The right to lien is given against the owner by statute, but the debt for which the lien is given must be one that is incurred in fulfilling the owner's contract. Being a personal privilege, the statutory right may be waived in favor of the owner, hence the owner may stipulate that it shall be waived. Of this there is no doubt, the only question being whether in a given case such stipulation has been made. Ordinarily the owner makes but one contract, viz., that with the builder, hence a provision in that contract that there shall be no liens is the owner's proffer or announcement that a waiver of liens is a condition of any debt incurred in fulfilling his contract. But waiver implies a meeting of minds, hence until knowledge of such provision is imparted to others the owner's condition is binding upon the builder alone; as soon, however, as knowledge of such provision is imparted to others, it constitutes as to them a known condition which they are at liberty either to accept or to decline. If with knowledge that such a condition is contained in the contract they accept employment under it, they accept the condition; if they decline to accept the condition they must decline to accept the employment. Common fairness requires that notice of the condition shall be given if a waiver of liens is to be claimed, and common honesty requires that when notice of the condition has been given no lien shall be claimed.

This rule avoids on the one hand the extreme of permitting the owner to claim the benefit of a waiver of which in common fairness he should have given notice, and on the other hand it avoids the opposite extreme of allowing a lien to be asserted which in common honesty must be deemed to have been waived.

Upon both reason and authority, therefore, we conclude that when a sub-contractor knows that a building contract under

which he is proposing to accept employment contains a provision that no lien shall be asserted, the mere acceptance of such employment will bar him from asserting a lien in opposition to such provision.

Applying this rule to the case in hand, in which the defendant was denied the right to show that the plaintiff, before undertaking to engage in the fulfillment of the building contract, had notice that it contained a provision that no sub-contractor should file any lien, the necessary conclusion is that such denial was an injurious error that entitles the defendant to a reversal of the judgment entered in the Circuit Court.

In the case of the Phœnix Iron Works Company against the same defendant, the first two points advanced for the reversal of the judgment are the same as those disposed of under the first and second assignments and will not be further discussed. The additional point is made that the boilers for which this lien is sought to be enforced were furnished more than four months before filing the lien claim and the commencement of suit. This contention rests upon and involves only a question of fact with respect to the date at which the furnishing of the material in question was completed. The court has critically examined the testimony upon this point and is satisfied that it was correctly dealt with by the court below. No useful purpose would be served by rehearsing the matter here. The error for which the Bates Machine Company case was reversed is not available to the defendant in this case; the testimony as to the sub-contractor's knowledge of the provision against liens was conflicting, hence there was no error in the refusal to nonsuit upon that ground. This judgment is affirmed.

In the case of William Henderson & Brother against the same defendant, the first and second points argued have been disposed of under the first and third assignments considered in the Bates case. The additional point urged is that the lien claim for erecting certain engines in the defendant's power-house included the expense of hauling such

engines from the freight station, and hence was not "labor furnished at the power-house." The contract was an entirety, and we think that these incidental items were, under the circumstances disclosed by the proofs, fairly within the undertaking to erect the machinery in question. 20 *Am. & Eng. Encycl. L.* 341.

The judgments recovered by the Phœnix Iron Works and Henderson & Brother are affirmed; the judgment recovered by the Bates Machine Company is reversed in order that there may be a *venire de novo.*

In the case of the.Bates Machine Co. *v.* Trenton and New Brunswick Traction Company—

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, DIXON, GARRISON, FORT, PITNEY, BOGERT, VREDENBURGH, VROOM, GRAY.   9.

In the cases of the Phœnix Iron Works *v.* Trenton and New Brunswick Traction Company and Henderson & Brother *v.* Trenton and New Brunswick Traction Company—

*For affirmance*—THE CHANCELLOR, DIXON, GARRISON, FORT, PITNEY, BOGERT, VREDENBURGH, VROOM, GRAY.   9.

*For reversal*—None.