86 N.J. Super. 520 (1965)
207 A.2d 346
GENERAL ELECTRIC COMPANY, A NEW YORK CORPORATION, PLAINTIFF,
v.
E. FRED SULZER AND COMPANY, A NEW JERSEY CORPORATION, CONTRACTOR, AND FRANK BRISCOE COMPANY, INC., A NEW JERSEY CORPORATION, BUILDER, AND AMERICAN CYANAMID COMPANY, A MAINE CORPORATION, OWNER, AND BARNET H. EPSTEIN, TRUSTEE OF THE ESTATE OF E. FRED SULZER AND COMPANY, A BANKRUPT CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 18, 1965.
*524 Messrs. McCarter & English, attorneys for plaintiff (Mr. James R.E. Ozias and Mr. Julius B. Poppinga, appearing).
Messrs. Levy, McCloskey, Schlesinger & Tischler, attorneys for defendants (Mr. Milton M. Breitman and Mr. John J. McCloskey, appearing).
LORA, J.S.C.
This is an action on a mechanic's lien claim wherein plaintiff materialman seeks judgment generally against the electrical subcontractor with whom it had contracted and specially against the owner of the lands and building.
Plaintiff General Electric Company (G.E.) seeks to enforce a lien claim against property of defendant American Cyanamid Company (Cyanamid) for materials and labor furnished *525 in the construction of Cyanamid's Executive and Administrative Center in Wayne Township, for which construction Frank Briscoe Company, Inc. (Briscoe) was the general contractor.
The electrical subcontractor, defendant E. Fred Sulzer and Co. (Sulzer), is in bankruptcy, and both Sulzer and Barnet H. Epstein, trustee of the estate of E. Fred Sulzer and Co., a bankrupt corporation, have failed to appear in this action and default has been entered against them pursuant to plaintiff's request for entry of default dated August 3, 1962 and filed herein.
By written contract dated February 1, 1961 Cyanamid, as owner, engaged Briscoe, as general contractor, to construct the said Center upon lands owned by Cyanamid.
Under date of February 13, 1961, by written contract, Briscoe engaged Sulzer to perform the electrical work on said project. On August 1, 1961, G.E., by its division, General Electric Supply Company (which is not separately incorporated), caused to be filed in the office of the Passaic County Clerk a notice of intention in proper statutory form and thereafter gave due notice of such filing to both Cyanamid and Briscoe. All of this was done in accordance with N.J.S. 2A:44-65, 71 and 72.
It has been stipulated that after August 1, 1961 and prior to January 10, 1962 G.E. delivered, on requisition or order of Sulzer, materials and services having an aggregate value of $312,975.01. One or more of the deliveries were made between December 25 and 29, 1961. It has also been stipulated that some materials and services were delivered and rendered prior to August 1, 1961.
Neither the Cyanamid-Briscoe nor the Briscoe-Sulzer contract was filed pursuant to N.J.S. 2A:44-75.
On April 25, 1962, which date was within four months from the date of the furnishing of the last materials or services by G.E., said company caused to be filed a mechanic's lien claim in proper statutory form in the Passaic County Clerk's Office upon which commencement of suit was endorsed by said county clerk pursuant to N.J.S. 2A:44-91, 92 and *526 99, and instituted this action by the filing of its complaint in the office of the Clerk of the Superior Court of New Jersey in accordance with N.J.S. 2A:44-98. By successive orders of this court, the time period prescribed by N.J.S. 2A:44-99 for prosecution of the claim to judgment has been extended to March 15, 1965.
The value of the materials and services for which a lien is claimed has been fixed by stipulation at $312,975.01, which sum is the amount due G.E. from Sulzer, less certain adjustments made for purposes of the stipulation of March 18, 1964. On April 22, 1964 judgment was granted against the defaulting defendants for $312,975.01, together with interest and costs.
The courts have been fairly unanimous in stating that those provisions of the statute creating the lien should be strictly construed, while those concerned with the enforcement thereof are to be liberally interpreted, Friedman v. Stein, 4 N.J. 34 (1950); Apex Roofing Supply Co. v. Howell, 59 N.J. Super. 462 (App. Div. 1960); Elliot-Farber Roofing & Siding Supply Co. v. Saitta, 79 N.J. Super. 568 (App. Div. 1963).

I.
Briscoe and Cyanamid have raised as a separate defense and contend that G.E. waived its lien rights by furnishing materials with knowledge of the provisions of the Cyanamid-Briscoe contract or of the Briscoe-Sulzer contract, or of both of said contracts.
The pertinent provisions of the aforesaid contracts are as follows:

CYANAMID-BRISCOE CONTRACT, CONDITION XI, LIENS
"CONTRACTOR shall indemnify and save harmless CYANAMID from all claims, demands, causes of action, or suits of whatever nature arising out of the labor and materials furnished by CONTRACTOR and its sub-contractors under this contract, and from all laborers', materialmen's and mechanics' liens upon the work or upon the property upon which the work is located arising out of the labor and materials furnished by CONTRACTOR and its sub-contractors under this *527 contract, and shall keep the work and said property free and clear of all liens, claims, and encumbrances arising from the performance of this contract by CONTRACTOR and its sub-contractors.

BRISCOE-SULZER CONTRACT
ARTICLE V. Sub-contractor agrees to co-operate with Contractor and all other Sub-contractors employed on the work in order to avoid complications and insure first-class workmanship in every respect, and further, that in the manufacturing, assembling and execution of the work, he will employ only men whose work will be acceptable to and in harmony with other workmen on the building. Sub-contractor further covenants and agrees on behalf of himself, his sub-contractors, materialmen and all parties acting through or under him that no mechanics' claims or liens shall be filed by him or any one acting through or under him, against the premises or buildings or fund covered by this contract. Sub-contractor shall deliver to the Contractor if and when required a complete release of all liens arising out of this contract or receipts in full in lieu thereof and if and when required an affidavit that to the best of his knowledge, information and belief the releases and or receipts include all of the labor and materials for which a lien could be filed.

* * * * * * * *
ARTICLE X * * *. The Sub-contractor shall submit to the Contractor an application for each payment, and if required, receipts or other vouchers showing payment for materials and labor. The Contractor may withhold payment to protect the Contractor from loss on account of, (a) defective work not remedied, (b) claims filed or reasonable evidence indicating the probable filing of mechanics' liens against the premises or buildings, or the fund for the construction of improvement, (c) failure of the Sub-contractor to make payments properly to materialmen and laborers, (d) a reasonable doubt that the Contract cannot be completed for the balance then unpaid."
Defendants cite the case of Bates Machine Co. v. Trenton, &c., R.R. Co., 70 N.J.L. 684 (E. & A. 1904) for the proposition that if the subcontractor accepts employment with the knowledge that the underlying building contract contains a provision against liens, he is deemed to have waived his right to the lien. Defendants also rely upon Mitchell v. Wrightstown Community Apartments, Inc., 4 N.J. Super. 321 (App. Div. 1949), and Stein v. Pennsylvania Dock, &c., Co., 10 N.J. Misc. 568, 159 A. 683 (Cir. Ct. 1932).
Plaintiff contends that the cases cited by the defendants do not support such waiver theory and that those which might be construed to support such theory were impliedly overruled *528 by the 1930 and 1957 amendments to the Mechanic's Lien Law.
Bates Machine Co. v. Trenton, &c., R.R. Co., supra, was an action to enforce a mechanic's lien. The claimant was the subcontractor of one Sciple. The trial court refused to permit evidence to the effect that the claimant, before entering into the contract with Sciple, knew of the provision against liens in the contract between Sciple and defendant. The underlying contract provided (it is not clear whether the following is extracted from the contract itself) that no subcontractor "should have any right to file any lien for any sum which might be due or become due to such subcontractor, and that any such right to file such lien was expressly waived." 70 N.J.L., at p. 690. The evidence was excluded on the ground that such knowledge was irrelevant.
The appellate court reversed, stating:
"* * * the greater weight of authority is that a provision in a building contract against the assertion of liens by any one will preclude a subcontractor or materialman, who has notice of such provision, from asserting a lien for labor or materials furnished pursuant to such contract. * * * Upon both reason and authority * * * we conclude that when a subcontractor knows that a building contract under which he is proposing to accept employment contains a provision that no liens shall be asserted, the mere acceptance of such employment will bar him from asserting a lien in opposition to such provision." (at pp. 692-4)
Plaintiff argues that the Bates case did not hold that knowledge of a lien waiver provision denies a materialman his lien, but ruled only on the admissibility of evidence as to such knowledge. Yet this court must look to the rationale of the ruling on the admissibility of the proffered testimony. Such rationale was clearly stated in Bates to be that if the claimant knew of the contractual provisions, he waived his lien rights.
G.E. further attempts to distinguish Bates on the grounds that the factual situation therein was quite different from that in the case sub judice. Bates involved as a claimant a *529 subcontractor of the general contractor, whereas G.E. herein is a materialman of a subcontractor and thus one step further removed from the owner. The contractual provisions at issue in Bates were in the contract between the owner and the general contractor. Plaintiff therefore argues that there has been no holding in New Jersey as to the admissibility of provisions in the contract between the general contractor and the subcontractor as against a third-party materialman, and concludes that evidence of language against liens in the general contractor's contracts with his subcontractors would have been excluded as irrelevant and immaterial as against a third-party materialman.
It is submitted that upon reason and authority Bates cannot be so restricted. The lien is the personal privilege of the laborer or materialman, and may be waived in favor of the property owner. Under Bates, when a subcontractor "knows that a building contract under which he is proposing to accept employment" contains a provision against liens, acceptance of employment results in waiver of the lien rights. Furthermore, it would appear unreasonable to argue that the owner could not assert waiver merely because the materialman obtained knowledge of the lien waiver provisions from the subcontractor rather than from the general contractor. See 76 A.L.R.2d 1110, sec. 6 for cases in other jurisdictions.
It is clear that under the ruling in Bates, if G.E. had knowledge of the lien waiver provisions when it undertook to deliver the materials, it waived all rights to the lien. Later cases have cited Bates for this waiver doctrine: Stewart Contracting Co. v. Trenton, &c., R.R. Co., 71 N.J.L. 568, 571-572 (E. & A. 1904); Stein v. Pennsylvania Dock, &c., Co., supra. Thus, there are at least three New Jersey cases which explicitly recognize and apply the waiver-through-knowledge concept. Additionally, Brewing Co. v. Donnelly, 59 N.J.L. 48 (Sup. Ct. 1896), at least by implication, recognized the doctrine. Mitchell v. Wrightstown Community Apartments, Inc., 4 N.J. Super. 321 (App. Div. 1949), cited by defendants, *530 involved an explicit waiver provision written into the contract with the claimant.
G.E. further argues that the New Jersey Legislature, by reason of the 1930 and 1957 amendments to the Mechanic's Lien Law, implicitly invalidated the waiver-through-knowledge doctrine. However, the Legislature has not seen fit to expressly enact into the Mechanic's Lien Law, provisions dealing with waiver. We must, therefore, resort to the case law and rules of statutory interpretation.
The legislatures of other states have written into their mechanic's lien statutes explicit provisions relating to waiver. For example, the New York Lien Law, McKinney's Consol. Laws, c. 33, § 34, provides:
"A contractor, subcontractor, materialman or laborer may not waive his lien, except by an express agreement in writing specifically to that effect, signed by him or his agent."
Illinois, on the other hand, provides by statute:
"If the legal effect of any contract between the owner and contractor is that no lien or claim may be filed or maintained by any one, such provision shall be binding," Ill. Stat. 1957, c. 82, § 21.
Within the United States there appears to be no one rule as to the requirements for waiver by knowledge. Some states hold that knowledge of the no-lien stipulation is sufficient; others provide that mere knowledge is not enough and that for waiver to be successfully utilized as a defense the claimant must have specifically contracted away the lien rights in writing; and still other states have filing provisions which make the no lien clauses effective, regardless of any actual knowledge on the part of the subcontractors. See 76 A.L.R.2d 1088.
With this background in mind, we must appraise plaintiff's contention that the New Jersey legislative amendments invalidated the waiver-by-knowledge doctrine of Bates. In 1930 the law was amended to provide for the filing of the notice of *531 intention, and in 1957 the Legislature added the provision requiring that notice of such filing be given to the owner of the property within five days thereof. Both amendments are now embodied in N.J.S. 2A:44-71. These sections require that notification be given the property owner of the fact that parties given lien rights under the statute have taken steps to perfect those rights. Apex Roofing Supply Co. v. Howell, supra. The property owner, upon receiving notification, may take appropriate measures to protect himself. The owner can, by controlling the disbursements of money, make sure that those attempting to perfect the lien obtain payment for their services, and he can file the contract and specifications under N.J.S. 2A:44-76. Such a filing on the owner's part would confine the value of the lien to services and materials rendered and furnished between the date of the filing of the notice of intention and the date of filing the contract.
Plaintiff contends that the filing and the notice provisions with which the claimant must comply are the only indices of "intention" which the court can consider. Thus, the proposition is advanced that if the claimant complies with the provisions of the statute he intends to claim a lien, while if he fails to comply he has no intention of claiming a lien. G.E. further says this has the salutary effect of avoiding the controversies which would otherwise arise in every case where an owner has put language against liens in his contract with the builder and then later claims that the materialman had knowledge of such language, accepted it as a condition of furnishing materials, assented to the condition and waived his right to the lien. Plaintiff further argues the statute eliminates all necessity for these inquiries into states of mind by requiring the materialman to declare his intention. By doing so he expressly repudiates any assent or acceptance of any condition which prior to the 1930 amendment might have been inferred from his supplying material with knowledge of the lien waiver provision.
However, the court cannot usurp the province or function of the Legislature in this connection. It is clear Bates *532 was definitely the law prior to the 1930 and 1957 amendments; that other legislatures have written explicit waiver provisions into their statutes when they desired to express a view on the subject; but that the New Jersey Legislature has not put such a provision into our statute. Moreover, these amendments simply give the owner notification of steps taken by the claimants. There is no indication that the claimants may not waive their rights to take these steps, nor any indication that these provisions preclude the parties from agreeing among themselves as to the applicability of the Mechanic's Lien Law to their particular transaction.
Under the appropriate rules of statutory construction
"* * * it is to be assumed that the Legislature is thoroughly conversant with its own legislation and the judicial construction of a statute placed thereon. * * * The construction of a statute by the courts, supported by long acquiescence on the part of the legislature, or by continued use of the same language, or failure to amend the statute, is evidence that such construction is in accordance with the legislative intent." Barringer v. Miele, 6 N.J. 139, 144 (1951); Asbury Park Press v. City of Asbury Park, 19 N.J. 183 (1955).
When statutory law is changed by the Legislature there is a presumption against any implied repeal or amendment of the existing provisions.
"In accordance with this conservative attitude, an amendatory a is not to be construed to change the original act or section further than expressly declared or necessarily implied." Sutherland, Statutory Construction (3d ed.), sec. 1930, p. 414.
It is submitted that Bates Machine Co. v. Trenton, &c., R.R. Co., supra, expresses the law to be applied in the case at bar; that is, a materialman's knowledge of a no-lien provision in the underlying contracts under which he undertakes to deliver material constitutes a waiver of all lien rights. However, it should also be recognized that the statute provides a very valuable right. Clear and unmistakable evidence of such knowledge is necessary before the court will find that *533 there has been a waiver, Cf., Otis Elevator Co. v. Stafford, 95 N.J.L. 79 (Sup. Ct. 1920).
The lien provision in the Cyanamid-Briscoe contract, even if communicated to G.E., would not establish any waiver of lien rights, since the language thereof seems to anticipate rather than preclude the filing of a lien claim.
Article V of the Briscoe-Sulzer contract, set forth above, contains a covenant of the electrical contractor, on behalf of himself, his subcontractors and materialmen, that no mechanic's claim or lien shall be filed by him or anyone acting through or under him, against the premises or buildings or fund covered by said contract. However, article V must be read in conjunction with article X of the Briscoe-Sulzer contract. As a result of such reading, it would appear that the filing of liens by materialmen was actually anticipated rather than proscribed.
However, assuming the clauses of both contracts did proscribe the filing of any liens, the court finds defendants failed to establish by a preponderance of the evidence that the language of either contract was communicated to G.E.
Insofar as the Cyanamid-Briscoe contract provision concerning liens is involved, defendants presented evidence from which they sought to have an inference drawn by the court, as trier of the facts, that G.E. had seen such contract and, more particularly, the lien clause provision therein. Defendants sought to prove that the contract and its lien provision would, of necessity, have had to be seen by G.E. personnel, who examined electrical plans and specifications which had been secured in order to prepare a bid. Defendants adduced testimony that G.E.'s Tom Minifie had obtained from Briscoe a full set of specifications and bid documents, and that an examination of the electrical specifications and papers would require a reading or examination not only of all the specifications but also of the papers contained in the bid documents and, more particularly, that portion of the bid documents designated "Conditions" which became a part of the contract between Briscoe and Cyanamid and which contained condition *534 11 concerning liens. While it is true that Minifie was not produced at the trial, G.E.'s testimony through one Cooke was that only the electrical apparatus specifications were brought to him (Cooke) by one of the three contractors' salesmen for G.E., who might have been Minifie; and there was read into the record depositions of G.E.'s Allen Cook that the plans and specifications which had been obtained and utilized were only for the electrical apparatus. Plaintiff's witnesses denied any requirement that a reading of all of the specifications and papers in the bid documents was necessary to prepare a bid.
The court finds that the evidence was insufficient for it to draw such inference that the bid documents and the lien clauses had to be read to prepare a bid, and that, in any event, such testimony was rebutted by the testimony of G.E. witnesses Schuyler, Cooke and Settino and corroborated somewhat by the testimony of McNulty, Sulzer's engineer and estimator, at the time.
The G.E. testimony established, and the court finds, that their examination of plans and specifications for the purpose of formulating a bid did not need to and did not extend beyond an examination of the electrical drawings and the specifications printed in Exhibit D-6, entitled "General Contract Specifications," which book was bound separately from Exhibit D-5, entitled "Bid Documents," the said "Bid Documents" containing a copy of the form of contract between Cyanamid and Briscoe. The "General Contract Specifications" booklet contained all the necessary addenda required to formulate a bid. In any event, the record does not establish, nor does the court find, that G.E. had a set of the "Bid Documents" in its possession.
Respecting the Briscoe-Sulzer contract, I find that the evidence adduced by defendants was insufficient to establish that the provisions of articles V and X therein were ever communicated or made known to G.E. or any of its personnel.
[The court here reviewed the conflicting testimony.]
*535 In view of all of the foregoing, the court concludes that defendants have not sustained the burden of establishing, by a preponderance of the credible evidence, that the lien provisions of the Cyanamid-Briscoe contract and the Briscoe-Sulzer contract, or either of them, were ever communicated to G.E.

II.
Defendants, Briscoe and Cyanamid, further contend, by way of defense, that G.E. and Briscoe entered into an agreement whereby G.E. agreed not to claim a lien if Briscoe obtained from Sulzer, and forwarded to G.E., checks made out to G.E. by Sulzer upon the occasion of each payment to Sulzer by Briscoe. I find that the defendants have failed to establish the existence of any such agreement by the preponderance of the credible testimony and evidence. Although Briscoe did, on occasions, follow the practice of forwarding checks, I find that this practice commenced independently of any arrangement with G.E. and that the procedure was established by Briscoe, not only as to G.E. but also as to several of the suppliers.
[The court here detailed the evidence supportive of this conclusion.]
Under Otis Elevator Co. v. Stafford, 95 N.J.L. 79, 82 (Sup. Ct. 1920), for defendants to prevail on this defense, there would have to be clear and unmistakable evidence of such an agreement.

III.
By way of additional defense it is contended by defendants that all materials were furnished by G.E. to Sulzer pursuant to a "bulk" or "entire" contract, or pursuant to a series of such contracts or a package deal, and that if some or any materials were furnished pursuant to such a contract prior to the date of the filing by G.E. of its notice of intention, no lien may be claimed for any of the materials furnished pursuant to such a contract. It is stipulated that some deliveries *536 were made by G.E. prior to August 1, 1961, the date of the filing. It is also stipulated that the materials and services, for which a lien is claimed, were all furnished after the filing date.
It is then defendants' contention that because G.E. failed to file the mechanic's notice of intention, as required by N.J.S. 2A:44-71, prior to the delivery of any of the material involved, it lost the right to a lien as to that material delivered after the filing. Defendants' argument is based upon the rationale that in accordance with the statute there can be no lien for materials delivered prior to the filing; that plaintiff here was delivering material under an "entire contract" with defendant Sulzer, and that under the doctrine of P.E. Guerin, Inc. v. Parson, 112 N.J.L. 56 (E. & A. 1934), where there is an "entire contract" the notice of intention must be filed prior to the initial delivery. It follows, defendants argue, that if plaintiff had the right to file at any time during the existence of the "entire" contract and thereby create the right to a lien as to materials delivered subsequent to the filing, defendant owner would be deprived of its right under the statute, for it could not file the contract to protect itself from the creation of the lien. Plaintiff, on the other hand, states that its contract with Sulzer was divisible and that, in any case, the characterization of the contract under which it was delivering material as "entire" or "divisible" does not affect its rights under the statute to create a lien as to materials delivered after the filing of the notice of intention. Plaintiff contends that Guerin, supra, does not support defendants' position and, further, that the imposition of a requirement for filing prior to any delivery where there is an "entire" contract would unduly restrict the applicability of the Mechanic's Lien Law.
There can be no doubt that the statute prohibits the creation of a lien for material delivered prior to the filing of a notice of intention, Apex Roofing Supply Co. v. Miller, 79 N.J. Super. 68 (App. Div. 1963); Friedman v. Stein, 4 N.J. 34 (1950).
*537 Before determining the proper characterization of the contract here involved, it is necessary to decide whether, assuming there was in fact such an "entire" contract, the statute requires a filing prior to the delivery of any material. If the statute does not require such a filing, there would, of course, be no need to determine the nature of the contract.
In the Guerin case plaintiff made and delivered hardware to furnish defendant's home between April 18 and 27, 1931. There was a finding that the items were delivered over a span of time under an entire contract entered into prior to 1930. The Mechanic's Lien Law prior to 1930 did not require the filing of a notice of intention. As set forth above, the law was amended in 1930 to provide for such a filing. Plaintiff had not filed such a notice and, in order to enforce the lien as to items delivered subsequent to 1930, contended that it was operating under an entire contract entered into prior to that date, and therefore the amendment of 1930 had no effect on the applicable procedures it utilized to perfect the lien. The court, at page 58 of its opinion in 112 N.J.L., held that the amendment "had no retroactive application to merchandise, the delivery of which was long before contracted for."
Defendants here contend that in Guerin the court held, in effect, that the making of an entire contract determined the rights of the parties. The Guerin court did hold that the 1930 amendment had no retroactive application, and thus the procedure to perfect the lien formulated by that amendment did not apply to contractual obligations created prior thereto. By implication we can say that had there been a "divisible" contract, the procedures necessary to perfect the lien as to those items delivered subsequent to 1930 would have been dictated by the amendment. It would appear that Guerin does not support defendants' position that where there is an "entire" contract, the notice of intention must be filed prior to any delivery, because actually the case did not deal with this problem. All the case stands for is the proposition that contractual rights are determined by the law in existence at the time the contract is formulated.
*538 There are cases in New Jersey involving the validity of a lien where material is delivered both prior and subsequent to the filing of the notice of intention. Generally, these cases have sustained the lien as to items delivered subsequent to the filing of the notice of intention as long as there is no willful inclusion in the lien claim of materials delivered prior to the filing. In these cases the courts have not been faced with the problem of characterizing the contract as either "entire" or "divisible" in order to sustain the lien, Apex Roofing Supply Co. v. Miller, supra; Friedman v. Stein, 4 N.J. 34 (1950); Elliot-Farber Roofing, etc., Co. v. Saitta, 79 N.J. Super. 568 (App. Div. 1963).
In at least two cases our courts have recognized that there may be a problem in sustaining a lien for part of the material where the parties are operating under an entire contract. Naidech v. Hempfling, 127 N.J.L. 430 (Sup. Ct. 1941); Sharav v. Scott, 37 N.J. Super. 224, 227 (App. Div. 1955). Yet, while there has been a recognition of the problem, there has been no New Jersey decision supporting the proposition that where there is an "entire" contract, the notice of intention must be filed prior to the delivery of any material. The mere fact that there is no New Jersey case law supporting defendants' position does not dictate the result, for there is, likewise, no New Jersey law supporting plaintiff's position. We must, therefore, resort to an interpretation of the relevant statutory provisions.
Defendants, as stated above, would have the court find that where material contracts are "entire," the Mechanic's Lien Law will not be available to protect any of the material unless the notice was filed prior to the first delivery. The court points out that a contract may be entire for some purposes and divisible for others, 3A Corbin on Contracts, sec. 687. For the moment the court is not concerned with, nor does it deal with, the problems of contractual divisibility arising from the necessity to determine the amount of the lien in lump sum contracts, but rather with defendants' position that where a contract is "entire" the Mechanic's Lien Law *539 can only cover either all or none of the items called for by the contract, depending upon the filing date and whether any materials were delivered prior thereto.
As set forth in Rothman Realty Corp. v. MacLain, 16 N.J. Super. 280, 284 (Ch. Div. 1951), affirmed 21 N.J. Super. 172 (App. Div. 1952):
"* * * [a] contract is entire when the promise of one party is conditional on entire performance by the other. It is divisible when the part to be performed by one party consists of several distinct and separate items respecting which the consideration is apportioned to each item or is left to be implied in law."
See also Dixon v. Smyth Sales Corp., 110 N.J.L. 459 (E. & A. 1933).
A characterization of the contract as entire or divisible will depend upon the intent of the parties. Integrity Flooring, Inc. v. Zandon Corp., Inc., 130 N.J.L. 244 (Sup. Ct. 1943). These concepts of entire and divisible have been criticized as fairly useless in the analysis of a problem, 3A Corbin on Contracts, sec. 688. The concepts have been applied in breach of contract situations where the issue is whether one party to the contract can stop his performance upon breach by the other party.
The issue here is whether the Legislature intended to incorporate such a concept into the Mechanic's Lien Law. In dealing with this issue the court must look to the motive and intent of the Legislature. State by Richman v. Sperry & Hutchison Co., 23 N.J. 38 (1956); Caputo v. Best Foods, 17 N.J. 259 (1955). In determining that intent we must look at the entire statute, Abrams v. Department of Civil Service of N.J., 70 N.J. Super. 559 (App. Div. 1961); 2 Sutherland, Statutory Construction (3d ed.), c. 45.
The Mechanic's Lien Act, as set forth in Shoemaker v. Maloney, 102 N.J.L. 363 (E. & A. 1926),
"* * * in substance, declares that every building to be erected shall be liable for the payment of any debt owing to any person for labor performed or materials furnished in the erection and construction *540 thereof, which debt shall be a lien on such building, and on the land whereon it stands, except, in the case where there is a contract and specifications on file, the land and building shall be liable to the contractor alone. Thus it is quite clear that the building and land become security for the payment of the debts of the laborers and materialmen, except in cases where a contract and specifications are on file." (at p. 365)
See also Apex Roofing Supply Co. v. Howell, 59 N.J. Super. 462 (App. Div. 1960).
In Woodbridge Lumber Co. v. Varacska, 194 A. 392 (Cir. Ct. 1937), the court said:
"It is very clear that the purpose of the statute is to secure to persons furnishing labor or materials for use in the construction of a building payment for such labor or materials, but it is likewise clear that it was also the purpose of the statute to provide a means by which owners might have a building erected for them without subjecting the land and building to a lien in favor of a person or persons to them unknown involving amounts over which the owner would have no control." (at p. 394)
There is no indication in any material dealing with the Mechanic's Lien Law that the Legislature intended the availability of the remedy to depend upon the type of contract between the parties. Moreover, the statute itself plainly contemplates the situation where material is furnished both prior and subsequent to the filing of the notice of intention. N.J.S. 2A:44-71. The Legislature has simply provided that there shall be no lien for materials furnished prior to such filing. It is not the court's function to either restrict or enlarge the applicability of the legislation. Smith & Richards Lumber Co. v. Hurley, 116 N.J.L. 429 (E. & A. 1936). To make the availability of the remedy depend upon a characterization of the underlying contract as "entire" or "divisible," where material has been delivered both prior and subsequent to the filing of the notice of intention, is to impose a serious and unwarranted restriction upon this remedial legislation.
Likewise, as to defendants' contention that because the contract was entire, once the delivery of material began *541 defendants could not file the building contract to halt the lien, the court states that since plaintiff had the right to file the notice of intention, defendant's certainly had the right to file the contract in accordance with N.J.S. 2A:44-76. Had defendants filed the contract, there would have been no lien for materials furnished thereafter. Suburban Lumber Co. v. Gerber, 11 N.J. Super. 141 (Law Div. 1951), modified 17 N.J. Super. 33 (App. Div. 1951); Smith & Richards Lumber Co. v. Hurley, supra.
The second part of defendants' divisibility argument turns on the proposition that where lienables and nonlienables are subject to one lumping charge in a contract, the court will not receive extrinsic evidence so as to determine the value of the lienables, and therefore there can be no lien at all. Defendants cite cases from foreign jurisdictions to support this proposition. Plaintiff counters that most of the cases cited involve situations where lienables and nonlienables were inseparably commingled in the lien claim itself. It further points out that there was no such commingling in its lien claim, and therefore there is no evaluation problem presented in this action. The cases cited by defendants do support the doctrine that
"* * * when lienable and nonlienable items are included in one contract for a specific sum, or are made the basis of a lumping charge so that it cannot be perceived from the contract or account what proportion is chargeable to each, the benefit of the mechanic's lien law is lost." Rinzel v. Stumpf, 116 Wis. 287, 93 N.W. 36, 38 (Sup. Ct. 1903).
There are at least two early New Jersey decisions which seem to support defendants' position: Whitenack v. Noe, 11 N.J. Eq. 321 (Ch. 1857), and Rizzolo v. Poysher, 89 N.J.L. 618 (E. & A. 1916). In Rizzolo the court cited (at p. 622) with approval Luce, N.J. Mechanic's Lien Law (2d ed), p. 96, for the proposition that "[a] claim is not necessarily bad, for including illegitimate, as well as legitimate items; for it may stand, quoad the good items; but if the good and the bad are inseparably blended, the claim will be bad."
*542 The law at the time of the Rizzolo case contained substantially the same provision as N.J.S. 2A:44-92  that if the particulars filed with the claim contain "a willful or fraudulent misstatement in such particulars of the matters above directed to be inserted in the lien claim," the land and building shall be free from the lien. It is not at all clear that at the present time the mere commingling of lienables and nonlienables will void the entire claim. Friedman v. Stein, 4 N.J. 34 (1950). In Friedman it would appear that the court could have disposed of the case on the grounds of inseparable commingling, but instead it relied quite heavily upon the proscription against willful misstatement.
However, assuming that Rizzolo and Whitenack accurately reflect the current law in New Jersey, and therefore that New Jersey is in accord with those jurisdictions cited by defendants, it becomes necessary to examine how the rule operates in the case at bar. It should be pointed out that in the present action there is no allegation that the lien claim includes nonlienables. Plaintiff has complied with N.J.S. 2A:44-92. This, at first blush, would not appear to answer defendants' argument, for the rule provides:
"Where lienable and nonlienable items are included in one contract for a specific sum, or are made the basis of a lumping charge, so that it cannot be perceived from the contract or account what proportion is chargeable to each, the benefit of the mechanic's lien law is lost. In such cases the court cannot, by extrinsic evidence, apportion the amount of the entire charge or contract price between the lienable and nonlienable items," Getty v. Ames, 30 Or. 573, 48 P. 355 (Or. Sup. Ct. 1897).
A later Oregon case restated the rule, but in quite different language:
"* * * a lien cannot be upheld if the lien notice mingles in unsegregational form lienable and nonlienable items. Such a defect cannot be cured by oral evidence." Barber v. Henry, 197 Or. 172, 252 P.2d 802, 803 (Sup. Ct. 1952). (Emphasis added)
Between Getty and Barber the Oregon Supreme Court decided Christman v. Salway, 205 P. 541 (1922). Oregon law provides *543 that for materialmen to obtain liens they must serve notice on the property owner within five days of the first delivery. The lien claimants in that action furnished materials and performed labor under "entire" contracts between the claimants and the owner's contractor. The materials became nonlienable because plaintiff failed to give the required notice, but they sued to enforce liens for the labor. The owner defended upon the ground that since the contract was "entire" and "included both labor and material, for which claimants were to be paid one round sum, with no stipulated price agreed to be paid for either labor or material, that having lost their right to a lien for the material, and it being impossible to ascertain from the contracts themselves what proportion of the contract price was agreed to be paid for the labor, the liens cannot be enforced for the labor alone or for any amount." Christman, at page 544.
The court quoted the rule as stated in Getty v. Ames, supra, and then went on to consider defendants' argument. I take the liberty of quoting quite extensively from the court's opinion:
"The statute expressly confers the right to a lien for labor performed or material furnished for use in the construction of a building. The right to a lien does not arise from the special contract under which the work was done, or the material furnished. It arises from the work which was performed upon the property, or the material furnished for use thereon. * * * The statute does not, in terms or by implication, deny the right to a lien to one who performs labor upon a building under an entire contract. The right to a lien exists whether the contract be express or implied, entire or divisible. If both labor and material are furnished, the right to a lien for the labor is preserved, whether the right to a lien for the material is lost or not, so far as anything said in the statute is concerned, as claimants' rights are dependent only upon employment and performance of work. Their right to a lien for labor or material, or for both, was a special privilege * * *, either one or both of which they could waive or not, as they pleased * * *. It is utterly impossible to ascertain or state from the contracts themselves what proportion of the contract price was agreed to be paid for either labor or material, as the contracts themselves provide no way in which that fact can be ascertained or determined. But we think this fact is wholly unimportant because the owner whose property is sought to be charged with the lien was not a party to these contracts, nor personally obligated to pay the contract *544 price, or any proportionate part thereof; nor is his property chargeable with a lien for the entire, or any proportional part of the price which the contractor agreed to pay for the labor and material. No rule is more firmly established in this state than that where labor is performed or materials furnished at the instance of the contractor of the owner, and not to the owner himself, or to a common-law agent of the owner, the law fixes the amount for which a lien may be had, as the reasonable value of the labor or materials, and not the price which the contractor agreed to pay therefor." (at p. 545)
As stated above, there is, as in Oregon, no indication that the New Jersey Legislature intended to restrict the application of the Mechanic's Lien Law to divisible contracts. As long as the lien claim contains only lienables, the fact that the underlying contract contains a lump sum charge is irrelevant. This is most certainly the case where the contract is between the materialman and the subcontractor, for here the lump sum is only evidential as to the value of the lien. Christman, supra; Bangor Roofing & Sheet Metal Co. v. Robbins Plumbing Co., 151 Me. 145, 116 A.2d 664 (Me. Sup. Jud. Ct. 1955).
While the court so concludes, it nevertheless finds that there was no "entire" or "bulk" contract between Sulzer and G.E. Additionally, the court states that even if the defendants established a single contract for all G.E. materials, or a series of agreements respecting specific groupings of materials, the agreement or agreements would, nevertheless, be separable.
Defendants contend that purchase orders 10029, 10197, 10037 and 10103 were entire and bulk contracts as to each purchase order, and that billings were not on a unit basis but on a pro rata basis of percentage of completion of the whole, and hence, in any event, plaintiff's claim should be reduced by $151,035.97, the value of goods delivered on such purchase orders after filing. Part of the materials thereon were delivered prior to the filing date. As to purchase order 10029 it would appear that four separate so-called "directs" covered the same, and therefore four separate acknowledgments thereon were involved.
*545 The court's recollection is that there was no testimony that billings were not on a unit basis but on a pro rata basis, except as to purchase order 10029, which was for the "gear" equipment used for the motor control centers and integral parts. Purchase order 10197 recited "quantities may vary  prices firm or better," and "no shipments without releases." McNulty's testimony was to the effect that Sulzer could delete items if not required for the job or if G.E. did not have the same, and Sulzer could, if delivery was not made when required, cancel and order elsewhere. Purchase order 10037 was an open order for all wiring devices, switches and receptacles submitted early in the job simply to get price protection  in fact the releases thereon were dated October 23 and December 15, 1961, long after the filing date. Purchase order 10103 was for all lamps, and while it set forth no actual prices, it did refer to other price sheets. However, it does not appear that the prices fixed by any of the purchase orders were ever changed during the course of the job, or that after acceptance of a purchase order by first order acknowledgment, of the series of "directs" required for each order, G.E. would have the right to increase the prices stated in the purchase order at any time subsequent thereto.
The court finds that the materials delivered prior to the filing date were severable from those delivered thereafter, and the value of each was fixed or ascertainable by computation. The exact value of materials furnished both prior and subsequent to the filing date was determinable by an examination of the relevant purchase orders, invoices and delivery documents. Counsel for plaintiff and defendants, as a result of such examination of the documents, entered into a stipulation as to the exact values of the materials delivered both prior and subsequent to the filing date, thereby conclusively demonstrating the severability of any contract or purchase order covering more than one shipment. The dealings between G.E. and Sulzer were not pursuant to any single written contract, nor did negotiations between G.E. and *546 Sulzer ever contemplate a single contract for all or substantially all the electrical materials required for the Cyanamid job.
The court further finds there were two initial quotations from G.E. to Sulzer (and other electrical contractors) listing the materials called for by the plans and specifications and setting forth a "street price," that is, a price known in the trade, to be subject to negotiation downward. The quotations were not an offer to sell subject to his acceptance, but an invitation to place orders on G.E. After receipt of same, Sulzer negotiated not only with G.E. but with other suppliers, besides which the materials actually ordered included materials other than those listed in the G.E. quotes. Purchase orders from Sulzer to G.E., 37 in all, were received in evidence; only four of them described goods delivered both before and after the filing date, and all bore the legend "Please Confirm," the said four purchase orders being the ones set forth above. Each shipment and release required a credit approval by G.E. There was considerable testimony as to "acknowledgements" from G.E. to Sulzer, apparently sent out to Sulzer when the materials on Sulzer's purchase orders were ordered from the several manufacturers involved. Consequently, if there were more than one manufacturer needed for the materials listed on one purchase order, several acknowledgements, rather than one, would relate to a single purchase order. Each acknowledgement copy of the "direct" forwarded to Sulzer constituted an acceptance of a portion of Sulzer's purchase order and bore a legend stating that the Sulzer order was "accepted subject to conditions on reverse hereof," and "This order is accepted on the condition the billing will be at prices in effect at time of shipment." Itemized pricing appeared on the acknowledgements. It is true that in some cases a "direct" would not be prepared for months after receipt of the purchase order due to the fact that G.E. might still be negotiating prices with a manufacturer. The conditions on the reverse side of the so-called acknowledgements or white copies of the so-called directs, which conditions also appeared on the quotation dated *547 January 17, 1961 and on the invoices, provided, among other things, as follows:

"STANDARD CONDITIONS APPLYING TO ALL TRANSACTIONS
All orders are subject to the acceptance of our district or local house serving the purchaser; and, unless otherwise stated, all sales are made f.o.b. point of shipment, and each shipment or delivery shall be considered a separate and independent transaction.

* * * * * * * *
No sales representative of the Corporation has authority to alter, vary or waive any of the foregoing standard conditions." (Emphasis added)
Additionally, the front side stated this order "is accepted subject to the conditions on the reverse side hereof." The phrase "direct" was used where a General Electric Supply Co. order was placed with a manufacturer for direct shipment to Sulzer. All of the conditions set forth above were known to Sulzer through McNulty before any orders were placed by Sulzer with G.E. and such conditions were thereafter restated in the many documents set forth above. Be all of this as it may, the court finds that severability was demonstrated conclusively at the trial despite the fact that many of the invoices covered many items that were shipped and delivered at different times; "fixtures" were bid on a lump sum price; some "apparatus" items were engineered items for which a total lump sum price was quoted; many items were not stock items but were designed to meet specifications on the job, and many shop drawings were required and conferences had to be held regarding them, and despite the fact materials required under purchase order 10029 covering all electrical apparatus for the project could not be used separately but were part of the so-called over-all gear (e.g., "67 lighting and power panels, 28 power transformers, 28 enclosed circuit breakers, etc.  all for the sum of $140,000.") Additionally, the Uniform Sale of Goods Law in effect at the time defines a divisible contract as follows:
"`Divisible' contract to sell or sale means a contract to sell or a sale in which, by its terms, the price for a portion or portions of the goods less than the whole is fixed or ascertainable by computation." (R.S. 46:30-1)
*548 The stipulation entered into by the parties clearly demonstrates that the sales were, in fact, divisible, all sums being the invoiced sums  the dollar amounts, invoice numbers and pertinent dates being developed from documents in the possession of the receiver for Sulzer. Nonlienable items, that is, items furnished prior to the filing date, were, in fact, severable from lienable items, so that a value could be allocated to each. Hence, it is immaterial that materials and shipments made before and after the filing dates were the subject of the same quotation from G.E. to Sulzer, the same purchase order, the same "direct," release, or invoice.

IV.
The parties have assumed conflicting positions as to how payments which have already been made should be applied on account of the debt. Cyanamid and Briscoe argue that the only debt secured by the lien, if any, is that created after the August 1, 1961 filing of the notice of intention, and that payments made after the filing should not be applied to any indebtedness arising out of materials delivered prior to that date. Plaintiff contends that since defendant Sulzer, in making the payments, did not specify how the money was to be applied, it had the right to apply the same to the earlier indebtedness and, therefore, none of the monies so paid can be used to reduce the amount of the lien.
The controlling rule was stated in Naidech v. Hempfling, 127 N.J.L. 430 (Sup. Ct. 1941):
"1. A debtor owing several debts to a creditor is entitled to direct application of any payment to whichever debt he wishes it applied. 2. If the debtor does not so direct, the creditor may make the application. 3. If neither party makes the application, and one debt is secured and another unsecured, a court of equity will usually direct application to the unsecured debt; and 4. as regards the items of a running account, payments not appropriated by either party will be applied to the earlier items." (at p. 432)
This rule was restated in Borough of Totowa v. American Surety Co. of N.Y., 39 N.J. 332 (1963).
*549 Defendants cite Hiller & Skoglund, Inc. v. Atlantic Creosoting Co., Inc., 40 N.J. 6 (1963), which arose under the Municipal Lien Act and the Trust Fund Act. Plaintiff therein, a general contractor, subcontracted work to Universal Pile Co. It, in turn, bought materials from Atlantic Creosoting. At the time of these purchases Universal had a prior outstanding debt with Atlantic for materials furnished for other jobs. Plaintiff paid Universal and it turned some of those funds over to Atlantic. The latter applied the funds to Universal's earliest outstanding debt, knowing that the funds came solely from the Hiller job. In this setting, the court held that it would be unequitable to permit Atlantic to apply the funds to the earliest debt.
The case does not support defendants' position because of the factual distinctions between it and the present case. There is no allegation that G.E. applied the payments from Sulzer to reduce debts arising out of anything other than the American Cyanamid job.
Consequently, the court concludes that G.E. properly applied payments received by it after August 1, 1961 to the oldest open invoices on the Cyanamid job at the time of receipt. As a matter of fact, they were applied to distinct invoices to Sulzer, i.e., the Sulzer checks so applied were in the amounts of such invoices.

V.
Plaintiff contends that it is entitled to a lien against the land and building of Cyanamid not only for the sum of $312,975.01, which is the stipulated amount of the materials and services delivered after August 1, 1961, but also for interest from the date or dates on which the amounts which make up the total lien claim became due to G.E.
While it would appear that under the Mechanic's Lien Law interest may be included in the judgment, Apex Roofing Supply Co. v. Kersner, 53 N.J. Super. 1 (App. Div. 1958); Elliot-Farber Roofing, etc., Co. v. Saitta, 79 N.J. *550 Super. 570 (App. Div. 1963), the court is mindful of the doctrine that interest should be assessed "in accordance with principles of equity in order to accomplish justice in each particular case." Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332 (App. Div. 1956). There are no hard and fast rules as to when interest is assessable. John Agnew Co. v. Paterson Board of Education, 83 N.J. Eq. 49 (Ch. 1914), affirmed 83 N.J. Eq. 336 (E. & A. 1914); Cohrs v. Igoe Brothers, Inc., 71 N.J. Super. 435 (App. Div. 1962). However, "interest should not be allowed where the damages are unliquidated and not capable of ascertainment by mere computation, or where a serious and substantial controversy exists as to the amount due under a contract." Jardine Estates v. Donna Brook Corp., supra, 42 N.J. Super., at page 341.
Here the court notes that not only was there a series of serious and, in some respects, novel issues involved, but that the determination of materials (and the values thereof) delivered both prior and subsequent to the filing date did involve lengthy and protracted discussions between counsel and their respective clients, as well as representatives of Sulzer, and exhaustive studies of innumerable documents and delivery slips, purchase orders, etc., leading to the stipulation fixing the amount of the lien claim. In the absence of such stipulation, the trial of the matters in dispute would have taken many, many days in excess of the nine trial days actually required to try the matters in issue between the parties.
The court determines, in view of the foregoing, that plaintiffs are not entitled to interest on their claim.
For the reasons set forth above, the court concludes that plaintiff is entitled to judgment against defendant, American Cyanamid Company, specially adjudging that it is entitled to a lien against Cyanamid's tract of land and building in the sum of $312,975.01, with costs, but without interest, and ordering that said sum and costs be made of and from said tract of land and building. An appropriate form of judgment should be submitted, consented to as to form, or to be settled by the court upon notice.