92 N.J. Super. 210 (1966)
222 A.2d 655
GENERAL ELECTRIC COMPANY, A NEW YORK CORPORATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
E. FRED SULZER & CO., ETC., ET AL., DEFENDANTS, AND AMERICAN CYANAMID COMPANY, A MAINE CORPORATION, OWNER, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 1966.
Decided August 23, 1966.
*212 Before Judges GAULKIN, LABRECQUE and BROWN.
Mr. Milton M. Breitman and Mr. Saul Tischler argued the cause for defendant-appellant (Messrs. Levy, McCloskey, Schlesinger & Tischler, attorneys).
Mr. Julius B. Poppinga and Mr. James R.E. Ozias argued the cause for plaintiff-respondent (Messrs. McCarter & English, attorneys; Mr. John R. Drosdick, on the brief).
The opinion of the court was delivered by BROWN, J.A.D.
Plaintiff General Electric Company (G.E.) recovered judgment against defendant American Cyanamid Company (Cyanamid), impressing a mechanic's lien on the latter's land and building in the Township of Wayne for material and labor furnished to defendant E. Fred Sulzer & Co. (Sulzer) in connection with construction of the Cyanamid building. The general contractor for the construction was defendant Frank Briscoe Company, Inc. (Briscoe). Sulzer, Briscoe's subcontractor, was adjudicated bankrupt before payment of its debt to G.E. and has not appeared in the action. Cyanamid has appealed from the judgment. There is a cross-appeal by G.E. contesting that portion of the judgment denying interest on the adjudicated amount of the lien claim.
The general contract was not filed and G.E.'s lien was based upon a notice of intention filed on August 1, 1961. The controversy centers upon the right of G.E. to this remedy. Cyanamid's contentions thereon are substantially as follows: (1) recourse to a lien claim was expressly prohibited by the general contract as well as the subcontract, and G.E. had notice of and was bound by these contractual provisions; and (2) G.E. was estopped to file the notice of intention because of a prior agreement with Briscoe for an alternative method *213 of securing payment from Sulzer. It further contended that, even if the notice was properly filed, (1) the over-all transaction constituted an entire or indivisible contract, or, at least, certain of the purchase orders resulted in entire contracts, so that G.E.'s delivery of material pursuant thereto before filing of the notice precluded a lien for any part delivered after the filing date; and (2) in any event, payments to G.E. made after the filing of the notice of intention, which were applied to Sulzer's indebtedness incurred before that date, should have been applied on account of the debt for which the lien is now sought.
The trial judge made determinations adverse to defendants as to each of these contentions.

I.
A large part of Cyanamid's brief is devoted to a close analysis of the lengthy record in support of its argument that, in finding that G.E.'s right to a lien was not barred and that it was not estopped to pursue the remedy, the court went "contrary to the believable testimony" and made credibility evaluations which were "totally illogical and untenable."
Assuming that the contracts forbade assertion of a lien, it was necessary for Cyanamid to prove that G.E. knew of the prohibition. Bates Machine Co. v. Trenton, & N.B.R.R. Co., 70 N.J.L. 684, 693 (E. & A. 1904). Cyanamid offered evidence of three meetings with G.E. representatives at which the prohibition against liens was allegedly discussed. In addition, Cyanamid offered proof that G.E. personnel would necessarily have been aware of the lien provision in the general contract in the course of preparing a quotation for the electrical work. All this was disputed by G.E.'s witnesses. The judge, in his written opinion, stated: "Such testimony is completely irreconcilable and the Court is unable to determine where the truth lies in this respect." Being thus "perplexed," the judge turned to a consideration of the conduct of the parties to resolve the contradictions.
*214 Joseph James McNulty, Sulzer's engineer and estimator, testified that at a meeting with G.E. employees in late February or early March 1961 he stated to them that a mechanic's lien "was in violation of the contract." Thomas Joseph Kearney, a Briscoe executive, stated that he had made the same thing clear to Eric Hundt, G.E.'s Newark credit manager, at a meeting with him during the following April. The seriousness with which Kearney regarded the consequences of filing a notice of intention was stressed by him, he said, at that time when he warned "no one could get paid."
If the prospect of filing a notice of intention engendered the reaction which McNulty and Kearney said they had expressed up to and including April, it is reasonable to expect that their principals, sometime during May, June or July, would have found a way to register with G.E. an unequivocal warning against the taking of such a step. Yet, after the notice was filed on August 1, no protest emanated from Briscoe or Sulzer. Only one formalized reaction is in evidence  the McCloskey letter of August 8 in which the effectiveness and propriety of the notice were apparently recognized. In no respect was it shown by defendants in their proofs that performance of the general contract or the subcontract was thereafter affected by what G.E. had done. Deliveries and payments continued into December. McNulty and Kearney who, according to their testimony, had each warned against such a contract violation, remained silent. We are led to the conclusion that the evident and continuing adjustment of Briscoe and Sulzer to the notice of intention constitutes a practical construction of the contract language favoring the availability of recourse to the lien procedure.
In short, our review of the proofs as a whole satisfies us that the structure of undisputed circumstances following the transactions referred to warranted the trial judge's determination that the burden of establishing the defense was not sustained.

*215 II.
In support of its defense that G.E. expressly agreed not to file a notice of intention, appellant relies upon the testimony of Kearney. Although the existence of such an understanding is said to be corroborated by the "check-swapping" arrangement actually carried out between the parties, it was only Kearney who was presented to establish the agreement itself. He testified that at the end of the April meeting he and Hundt had a conversation apart from the others in Kearney's office. Kearney asked Hundt whether Briscoe's supervision of Sulzer payments would be acceptable. Hundt later confirmed by telephone that this would be "all right."
This version of what transpired with Hundt was flatly contradicted by Hundt. He said the matter was broached by Kearney on July 14 when they met for the first time. On this occasion, according to Hundt, the Westinghouse notice of intention was mentioned and Kearney said "he had made arrangements" for forwarding Sulzer checks to G.E. Hundt further testified that he told Kearney he had no objection to this.
The judge resolved the credibility issue as to the meeting date in conformity with Hundt's recollection and held that it followed filing of the Westinghouse notice of intention on June 22. This finding was sufficiently supported, considering the opportunity of the trial court to judge of the credibility of the witnesses. It is noted that Kearney, in his deposition of December 16, 1963, stated that he did not "remember actually" whether the understanding with Hundt took place in the office at all or "whether we held the whole thing over the phone. The first definite memory of his coming in was when he came in to supersede the agreement with his "superior." McNulty was "positive" that the Briscoe transmittal of Sulzer checks began with the Westinghouse notice. Even Rowett's statement that "there was at least one other prior occasion" (before June 23) when unlisted checks were handled, would not constitute affirmative proof that the practice *216 began at a time related to a conference between Kearney and Hundt in April and because of it.
We conclude that the record supports the finding that Briscoe established, and was conducting, the check forwarding practice before the alleged conversation between Hundt and Kearney. Appellant has not carried the burden of proving that it was the product of an express agreement with G.E. by which the latter is estopped to claim a lien. Again, we are impressed by the conduct of the parties following August 1. Despite the filing of the notice of intention, allegedly in breach of an express agreement not to do so, the "in lieu" check arrangement was continued by Briscoe without protest or interruption until December.

III.
Defendant advances the point that plaintiff cannot claim a lien because the notice of intention was filed after deliveries were made. The legal argument depends upon an underlying fact, namely, that plaintiff and Sulzer entered into a bulk or entire contract for consummation of their full transaction or at least, that purchase orders 10029, 10197, 10037 and 10103 produced individual contracts of that nature. The trial court determined that "there was no `entire' or `bulk' contract" between the parties. Defendant contends that the evidence was to the contrary.
Although defendant refers to "the overall agreement for the supply of material" and "the contract," there was no showing of any comprehensive understanding, written or oral, by which plaintiff was bound at a single moment of time to supply all of Sulzer's requirements. It is stipulated that plaintiff's delivery of materials and services after August 1, 1961, on Sulzer orders, had an aggregate reasonable value of $312,975.01. But, at the inception of their relationship, G.E. and Sulzer were negotiating for the purpose of fixing an aggregate price on a smaller quantity of material, the so-called "gear" equipment which formed a functional component of the total electrical job. The items were listed in *217 the General Electric Apparatus Sales Division quotation of January 16, 1961 at a "Lot net contractor price" of $205,954. It was this price which Sulzer sought to reduce through the "horse trading" mentioned by McNulty. The effort was successful because the same equipment was subsequently purchased by order 10029 at a total price of $156,000 (of which $16,000 was subject to renegotiation).
This quotation and purchase order constitute the only documentary proof of a lump sum figure. There was no testimony relevant to any other bulk contract except the deposition conclusion of John T. Rogers, representing General Electric Supply Company, who said that there was a "lump price for the lighting fixtures only." However, no probative details are furnished in the record.
Apart from the equipment comprehended by purchase order 10029, many of Sulzer's requirements were furnished as the result of orders for material itemized by unit prices in the General Electric Supply Company January 17, 1961 quotation. This is true, at least, of purchase orders 10197 (for wire), 10037 (for wiring devices and plates), and 10103 (for lamps). The words "please confirm" appeared at the bottom of each of these order forms. A written acknowledgment was sent to Sulzer in each instance. It consisted of a copy of the "direct." On the front of the acknowledgment the following appeared:
"We thank you for your order, which is accepted subject to the conditions on the reverse side hereof.
This order is accepted on the condition that billing will be at prices in effect at time of shipment."
On the reverse side, this was stated:

"STANDARD CONDITIONS APPLYING TO ALL TRANSACTIONS
All orders are subject to the acceptance of our district or local house serving the purchaser; and, unless otherwise stated, all sales are made f.o.b. point of shipment, and each shipment or delivery shall be considered a separate and independent transaction.

* * * * * * * *
*218 No sales representative of the Corporation has authority to alter, vary, or waive any of the foregoing standard conditions."
Each invoice reiterated the foregoing language from the "standard conditions."
It is therefore evident that Sulzer had no contract, bulk or otherwise, with G.E. by which the latter was obligated to supply wire, wiring devices and plates or lamps prior to placement of the described purchase orders. Unit prices for the material were quoted by G.E.; orders were placed by Sulzer for confirmation, and the orders were "accepted" by G.E. on prices effective at the time of shipment. This procedure for "acceptance" of "orders" was clearly stipulated in the extended quotation of January 17. In view of this manifestation of the intention of the parties, there is no record foundation for defendant's contention that there was an "overall agreement for the supply of material."
Defendant asserts, alternatively, that at the very least, each of the four designated purchase orders resulted in an entire or bulk contract so that no item supplied thereunder would be lienable without the filing of a notice before performance of the contract was commenced.
No legal authority in any jurisdiction has been cited by defendant in which such a principle has been articulated. But defendant refers to P.E. Guerin, Inc. v. Parson, 112 N.J.L. 56 (E. & A. 1934), where, it is said, the rule is implicit. We agree with the trial judge in his conclusion that Guerin does not support defendant's position. It stands for no more than the holding that amendment of the statute, so as to require the filing of a notice of intention, ought not to be applied retroactively to preclude a lien for materials furnished prior to the amendment under a contract entire in nature. We find no decisional law under which eligibility to assert a lien has been governed by classification of the correlated contract as "entire" or "divisible." And we concur in the trial court's determination that there is no indication of an intention on the part of the Legislature to incorporate such a concept into the Mechanics' Lien Law.
*219 Defendant refers to a number of cases where courts of other states have barred lien claims because nonlienable items were included. In all of them a common problem was presented  inability to ascertain a lienable quantum. Rinzel v. Stumpf, 116 Wis. 287, 93 N.W. 36 (Sup. Ct. 1903), is typical of the category referred to. Thus, beginning at page 38 of the opinion as reported in 93 N.W., the court said:
"The bid of plaintiff was to do the work for a lump sum; hence, it not appearing how much the lienable and nonlienable articles were to cost, the judgment cannot stand. * * * His contract is an entire one, for a fixed sum and cannot be separated or apportioned so as to sustain a lien * * *."
A difficulty of that type is not here involved. It has been stipulated that materials having a value of exactly $151,035.97 were delivered after filing of the notice of intention and pursuant to the four purchase orders in question. The court in Rinzel distinguished North v. La Flesh, 73 Wis. 520, 41 N.W. 633 (Sup. Ct. 1889), where a lien was allowed, with the following summary of its holding:
"* * * where lienable and nonlienable articles are charged in one account, and the value of the lienable articles can be readily ascertained from the account without a restatement thereof, the right to a lien is not impaired." 93 N.W., at p. 38.
We conclude, on the facts of this case, that all of the material delivered after August 1, 1961 is covered by plaintiff's lien claim.
We find no error in the trial court's holding that payments received by G.E. after August 1, 1961 could be applied to the oldest open invoices on the Cyanamid job. Naidech v. Hempfling, 127 N.J.L. 430, 432 (Sup. Ct. 1941). As for the cross-appeal of G.E., we see no reason to disturb the considered judgment of the court that in this case interest on the lien claim should be denied.
The judgment of the Law Division is affirmed.