In re APPLIED LOGIC CORPORATION, Bankrupt.

NEW JERSEY NATIONAL BANK, Plaintiff-Appellant,

v.

Daniel GUTTERMAN, as Trustee of Applied Logic Corporation, Bankrupt, Defendant-Appellee.

No. 671, Docket 77–5034.

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1978.

Decided April 27, 1978.

Michael S. Landes, New York City, (Hahn, Hessen, Margolis & Ryan and Gilbert Backenroth, New York City, of counsel), for plaintiff-appellant.

Mark D. LeBow, New York City (Coudert Brothers and Victor C. Murphy, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, MULLIGAN and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from an order of Judge Goettel in the District Court for the Southern District of New York affirming an order of Bankruptcy Judge Babitt raises questions of some difficulty concerning a bank's rights to exercise a set-off of an unsecured debt owed it by the bankrupt against deposits and certificates of deposit held by the

bank. The Bankruptcy Judge and the district court decided adversely to the bank. Although the case is close, we are constrained to reverse.

## THE FACTS

The bankrupt, Applied Logic Corporation, (ALC) is a New Jersey corporation in the computer time sharing business whose headquarters were in Princeton, N. J. In 1967 it opened a demand checking account ("the account") with appellant New Jersey National Bank (NJNB) and was given a $100,000 line of credit. ALC incurred indebtedness to NJNB in much larger amounts and became indebted to other banks. By September, 1970, its bank debt had risen to $1,300,000, held as follows:

| | |
|---|---|
| New Jersey National Bank | $ 650,000 |
| First National Bank of Princeton | 300,000 |
| Chase Manhattan Bank | 250,000 |
| First National City Bank | 100,000 |
| | ————— |
| | $1,300,000 |

In addition ALC had entered into various equipment leases under which it was in arrears in an amount exceeding $2,000,000 and owed Digital Equipment Corp. (DEC) over $1,000,000 for purchases of equipment. Discussions between ALC, the banks, five lessors, and DEC resulted in an agreement dated September 2, 1970. Summarily stated, this provided as follows: The five lessors granted a moratorium on all rental payments until August 1, 1971; the deferred payments were to be paid in 26 equal monthly installments beginning on that date except that if ALC's cash flow would not permit, the beginning date for the deferred payments could be postponed to August 1, 1972. The banks also agreed to forbear demand for payment of principal until August 1, 1971. The bank indebtedness was to be converted into two notes

"payable at the New Jersey National Bank" one in the amount of $300,000, "which shall be held by New Jersey National Bank on behalf of First National Bank of Princeton", and the other in the amount of $1,000,000, "which shall be held by New Jersey National Bank on behalf of the other Banks."[1] Payment of interest on the $300,000 but not on the $1,000,000 note was deferred until August 1, 1971. ALC was to "conduct all banking of its funds at and through New Jersey National Bank until both notes are paid." Special arrangements, unnecessary here to detail, were made between ALC and DEC. NJNB extended to ALC an irrevocable line of credit in the amount of $750,000 until August 1, 1971. None of this was to be drawn down unless ALC raised $300,000 through the sale of convertible notes. The banks other than First National Bank of Princeton were to participate ratably in this line of credit. All loans taken by ALC pursuant to the new line of credit were to be secured in a manner detailed in the agreement and interest was to be paid monthly.

The 1970 agreement also provided for a committee of five members, one member for each of four lessors and NJNB, which was to monitor ALC's business. Any member of the Committee could cause the agreement to be terminated if for monthly periods ending on June 30, 1971, ALC's cash expenditures exceeded cash receipts by more than specified amounts, or operating revenues fell below specified amounts, or in certain other events. Any three members of the Committee could terminate the agreement if more rigorous terms were not met.

On May 25, 1971, ALC took down the last $100,000 of the line of credit provided by the 1970 agreement.[2] Although, as stated, Chase Manhattan Bank and First National City Bank had agreed to participate in the loan, NJNB alone advanced the $100,000. In the demand note evidencing the loan, ALC pledged as security:

---

1. Obviously what was meant was "on behalf of itself and the other Banks."

2. Apparently the $650,000 previously loaned has been repaid or otherwise satisfied. On this and much else, the record is regrettably meager and confusing.

All unencumbered assets, including specifically: Fixtures and equipment as listed in Schedule A–B attached, all inventory and after acquired inventory, all accounts receivable now or arising hereafter, all notes receivable as listed on Exhibit # 1, attached.

The note was accompanied by a security agreement and a financing statement containing the same statement of collateral, the latter of which apparently were filed in accordance with § 9–401 of New Jersey's version of the Uniform Commercial Code.[3]

As ALC's financial situation continued to deteriorate, it entered into a new agreement, dated September 15, 1971 with the parties to the 1970 agreement, and another creditor, Bryant Computer Products. The amended agreement required ALC to use its best efforts to raise a minimum of $500,-000 in cash as working capital. Once ALC raised $300,000, the banks and the lessors would reduce their existing claims (other than the $100,000 secured loan by NJNB) by half in consideration of stock or non-interest bearing subordinated notes or both. ALC was to make monthly payments to a special account in NJNB in an amount determined by its cash flow;[4] such payments were to be applied to payment of ALC's debt in a manner described in the agreement. Nothing contained in the agreement was to affect any security interest held by any bank or lessor. ALC's board of directors was to be reconstituted so that persons designated by the lessors would constitute a majority; there was also to be one person designated by the banks. ALC was required to report an aging of its accounts receivable monthly to the banks. Any creditor could declare his debt to be immediately due and payable if ALC failed to meet specified cash flow goals, if it failed to raise the full $500,000 working capital required by the agreement or under other specified conditions.

Michael Lynch, executive vice-president of NJNB, became the banks' representative on ALC's board of directors. The special account called for by the 1971 agreement was never established. Instead the minutes of a directors' meeting held on August 29, 1972, recite:

> The Board authorized payment of creditors directly instead of through a special account to expedite the receipts by individual parties.

The record suggests that the requisite amount of working capital was raised, though it is not clear whether the deadlines for this specified in the agreement were met.[5] Any such amounts as well as receipts in the ordinary course of business were paid into the general account which ALC had established in 1968. Mobach, the president of ALC, testified that payments were made from the general checking account in accordance with the formula in the 1971 agreement, though there was no documentary evidence corroborating this or showing the dates or amounts of any such payments. When monies accumulated in the account in excess of $100,000, NJNB, with ALC's approval, would invest these in its own certificates of deposit, of which it retained possession; the certificates would be "rolled over," again with ALC's assent, when they matured.[6] While NJNB did not insist on

---

3. At least the Trustee does not contend otherwise.

4. The formula was: The lesser of 50% of the excess of cash receipts over cash expenditures for the previous month or of the average of such excess for the previous three months. The agreement also established complicated priorities for the application of these funds.

5. The agreement did not require that any such amounts be placed in the special account. Apparently such amounts were placed in the general account and used for normal business purposes.

6. Mobach testified that in May or June, 1974, NJNB declined to permit ALC to use the proceeds of its certificates of deposit to purchase certificates issued by other banks which carried higher interest rates, though the bank had previously allowed ALC to purchase commercial paper with these funds. While he stated that there were several occasions of such refusal, he specifically identified only one instance. Lynch testified that this occurred after ALC's debts were accelerated in early July, 1974. Neither the bankruptcy judge nor the district court resolved this conflict.

initialing checks since this might adversely affect ALC with customers, there were a few (apparently only two or three) occasions on which it inquired about a particularly large check.[7]

In June, 1974, about the time of discussions of ALC's likely inability to meet its obligations under the agreements, ALC endeavored to transfer a $100,000 certificate of deposit from the NJNB account to its account at the Princeton National Bank[8] for the purpose of meeting a payroll. In accordance with Lynch's instruction permission for this was refused. On July 3, 1974, NJNB notified ALC in writing that the latter was in default, which seems to be conceded, and that NJNB was accelerating ALC's debt to it, and Lynch resigned from ALC's board. Later NJNB told ALC that it intended to set off the balance in the account against its debt. At ALC's request NJNB agreed not to do this temporarily if ALC would maintain its existing balance. Thereafter NJNB examined each check to make certain that it was being used solely for operating purposes. On December 3, 9, and 31, 1974, NJNB applied certificates of deposit in the respective amounts of $100,739.58, $101,551.11 and $41,485.42[9] against the balance of $325,000 due on its unsecured loan; in April, 1975 it applied funds in the account of $1,682.98 and a cashier's check in the amount of $830.62 representing interest on a CD against the loan balance. On April 1, 1976, NJNB set off an additional $26,095.76.[10]

Meanwhile, on March 27, 1975, ALC had filed a petition in the District Court for the Southern District of New York under Chapter XI of the Bankruptcy Act. Later, on August 10, 1976, it was adjudicated a bankrupt and Daniel A. Gutterman was appointed trustee. In the interval NJNB had filed a complaint, pursuant to Part VII of the Rules of Bankruptcy Procedure, before Bankruptcy Judge Herzog with respect to the $100,000 secured note. It alleged that $56,862.93 of the principal was due and unpaid[11] and sought a declaration of the validity of its lien, a disposition of the collateral to satisfy its claim, and leave to file an unsecured claim for any balance. ALC filed an answer and counterclaim, which were later amended contending that the setoffs were not permitted by § 68 a of the Bankruptcy Act, constituted preferences voidable under § 60 and, if valid, had first to be applied to the balance due on the $100,000 loan. Trial was begun before Bankruptcy Judge Herzog and was continued, after his retirement, before Bankruptcy Judge Babitt. The only witnesses were Mobach and Lynch. The Trustee in bankruptcy has adopted the position previously taken by the debtor in the Chapter XI proceedings.

7. Although the bankruptcy trustee's brief refers to NJNB's questioning of checks on "several occasions," the record reflects only one or two instances of this prior to the denouement described below, and possibly another one in December 1974, after acceleration of the indebtedness. All concerned checks drawn by ALC to its landlord; NJNB honored these after explanation. We thus do not understand either the meaning or the basis for the statement of the bankruptcy judge that by the 1970 agreement "ALC was prohibited by plaintiff . . in anyway to reduce the bank's capital."

8. NJNB had consented to the retention of this account since New Jersey law required it in order to facilitate the cashing of payroll checks by employees. See Labor and Workmen's Compensation Law, 34 N.J.S.A. § 11–4.2.

9. In order to secure a $60,000 letter of credit from the bank which was posted as security while ALC litigated a tax dispute with the state of New Jersey, ALC assigned to the bank a $100,000 certificate of deposit on November 1, 1974. This was some time after the acceleration of ALC's indebtedness and the subsequent agreement to maintain the balance in the account. The entire CD was assigned so as not to forego the higher yield available for certificates of that denomination. The $41,485.42 set off by the bank on December 31, 1974 was the portion of the CD, plus interest, which was not necessary to secure the letter of credit.

10. The state tax liability was ultimately determined to be $33,904.24. The amount of $26,095.76, set off on April 1, 1976, was the remainder of the $60,000 of the assigned CD plus interest.

11. It is not entirely clear how the balance due on the $100,000 loan was reduced to $56,862.93, but there are indications that ALC had paid off the remainder under the formula specified in the 1971 Agreement.

## THE OPINIONS BELOW

Bankruptcy Judge Babitt began his opinion by agreeing with the Trustee that under the 1971 agreement any amount properly set off should be applied first to the balance due on the $100,000 secured note. He held, however, that despite the seemingly mandatory language of § 68 a of the Bankruptcy Act [12] "the right to set off given by Section 68(a) has consistently been held to be within the discretion of the Bankruptcy Court," which it exercises "on the general principles of equity." Stating that the right of setoff extends only to general deposits but not to monies that have been deposited for a special purpose, he conceded ALC's account with NJNB did not come "within the accepted definition of a special deposit so as to be insulated from the plaintiff's right of setoff." Nonetheless, relying particularly on the decision of a divided court in *First Nat'l Bank of Portland v. Dudley*, 231 F.2d 396 (9 Cir. 1956), he found that NJNB's role in the financial arrangements was such as to impress a trust upon the deposits and estop the bank from asserting its right of setoff, concluding that "a much better case would have had to have been made to permit derogation of the principle of equality among creditors." The bankruptcy judge entered an order denying NJNB's complaint with respect to the $100,000 secured note except to the extent of $40,000 which had been realized upon the sale of tangible assets and granting defendant's counterclaims for the amounts set off by NJNB less the $40,000.[13]

On appeal Judge Goettel thought it "possible to distill plaintiff's challenges" into three: (1) denial of procedural due process in that plaintiff was not given adequate notice that ALC intended to rely on a theory of estoppel, as allegedly was required by F.R.Civ.P. 8(c), made applicable to adversary proceedings in bankruptcy by Bank-

ruptcy Rule 708; (2) that the findings of fact were inadequate or clearly erroneous and the holding inconsistent with applicable law; and (3) that the order did not conform to the opinion. Overruling all of these challenges, Judge Goettel affirmed the order of the bankruptcy judge. This appeal followed.

## DISCUSSION

■ In our view, the bankruptcy judge and the district court erred in their basic approach. It is true, of course, that "equitable principles govern the exercise of bankruptcy jurisdiction," *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), and that, as said by the bankruptcy judge, "One of the dominant impulses in bankruptcy is equality among creditors." But we are here concerned with § 68 a, "the dominant impulse" of which is inequality among creditors. See *New York County Nat'l Bank v. Massey*, 192 U.S. 138, 148, 24 S.Ct. 199, 48 L.Ed. 380 (1904); 4 *Collier, Bankruptcy* ¶ 68.01[3] at 846–48 (14th ed. 1975); 3 *Remington, Bankruptcy* § 1434.5 (rev. ed. 1957). See also *Cumberland Glass Manufacturing Co. v. DeWitt*, 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915) ("While the operation of this privilege of setoff has the effect to pay one creditor more than another, it is a provision based upon the generally recognized right of mutual debtors which has been enacted as part of the Bankruptcy Act, and when relied upon should be enforced by the court."). For example, in a case where there are no other assets, § 68 a allows a creditor who owes the estate the same amount that it owes him to come out whole while other creditors get nothing. The rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be "unjust." It is a rule that has

---

**12.** In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

**13.** In essence, rather than ordering payment of the $40,000 in cash, the bankruptcy judge permitted NJNB to take it as a setoff. While leave to file an unsecured claim for the balance of the $100,000 loan was not expressly granted, we presume NJNB would have been allowed to do this.

been embodied in every bankruptcy act the nation has had,[14] and creditors, particularly banks, have long acted in reliance upon it. *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 529, 33 S.Ct. 806, 57 L.Ed. 1313 (1913). Efforts made during the passage of the Chandler Act to render § 68 a inapplicable even in a limited fashion that would not cover this case, namely, when the creditor incurred his indebtedness to the bankrupt under such circumstances that a transfer by the bankrupt to him at the time would constitute a voidable preference and similarly to limit setoff against bank deposits were rejected by Congress. See 4 Collier, *supra* ¶ 68.01[3] at 844–48.[15]

█ It is indeed settled law that a bank cannot exercise a setoff against a deposit which is known by it to be dedicated to a special use, *e. g.*, for the sole purpose of meeting payrolls or paying taxes. *United States v. Butterworth-Judson Corp.*, 267 U.S. 387, 394–95, 45 S.Ct. 338, 69 L.Ed. 672 (1925); *First Nat'l Bank of Clinton v. Julian*, 383 F.2d 329, 337–38 (8 Cir. 1967); *Kaufman v. First Nat'l Bank of Opp*, 493 F.2d 1070, 1072 (5 Cir. 1974); 4 Collier, *supra*, ¶ 68.16 at 912–13. If in fact such deposits were "made in trust," as some courts have said, or constituted contracts between the depositor and the bank for the benefit of a third party who could enforce it against the bank, the cases could be explained on the simple ground that the situation was not one of "mutual debts or credits," to which alone § 68 a applies. However, the principle seems to go beyond such cases and to include others where courts say that the bank is "equitably estopped from a

setoff." What this really means is that by accepting the deposit for a special purpose the bank has agreed, at least implicitly, that the deposit should not be subject to its claims against the depositor and that it will be held to such agreement.

While eschewing reliance on the traditional statements of this doctrine, the bankruptcy judge and the district court apparently thought that the deposits with NJNB came within a subclass or perhaps more appropriately an outgrowth of it made up of cases where a bank has participated in an arrangement of the financial affairs of a troubled company and the courts found implicit in the bank's behavior an agreement that the deposit shall be held for the payment of certain creditors, which would be breached if the bank applied the account to pay itself. This principle was applied in *Union Trust Co. v. Peck*, 16 F.2d 986, 987–88 (4 Cir.), *cert. denied*, 273 U.S. 767, 47 S.Ct. 571, 71 L.Ed. 882 (1927). The facts are sparsely stated but the court said:

> It is, moreover, to be noted that, before and at the time the bank applied these amounts to its own use, it, the bankrupt and the other creditors were conferring as to the possibility of keeping the bankrupt upon its feet as a going concern by securing the general acceptance of a scheme of reorganization which contemplated the creditors taking less than was due them. Under such circumstances the deposit by the bankrupt of large sums in the bank, which both it and the bankrupt intended should be used for the reduction of the former's debt, were obviously not

---

14. See 4 Collier, *supra* ¶ 68.01[1] at 843–44.

15. The bill for the amendment of the Bankruptcy Act now pending in Congress contains provisions restricting the right of setoff. See H.R. 8200, § 553, 95th Cong., 1st Sess. (1977), and House Report, H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 183–86 (1977). The bill would prohibit setoff of any debt owed by the creditor which was incurred within 90 days of the filing of the bankruptcy petition, while the debtor was insolvent, and for the purpose of obtaining a right of setoff against the bankrupt. Except for the change in the time period, this largely codifies existing case law. The bill goes beyond current law in prohibiting setoff of any

increase in the amount of debt owed by the creditor to the debtor during the 90-day period preceding bankruptcy. In addition, a presumption that the debtor is insolvent during that period would be enacted.

The bill also provides for an automatic stay of any setoffs upon filing of the bankruptcy petition. H.R. 8200, *supra*, § 362(a)(7). The stay is lifted unless the party asserting the right of setoff is adequately protected, *i. e.*, in this context, is insured of payment of the portion of the debt equivalent to the amount on deposit with the bank. See H.R.Rep.No.95–595, *supra* at 185.

made in ordinary course, in any fair sense of that phrase. Most men would feel that it is an implied term of such negotiations that during their pendency nobody taking part in them shall do anything to secure preferential rights in or over any assets of the bankrupt which did not belong to it when the conferences began, or upon which it did not then have a prior lien. It follows that so much of the decree below as is challenged by the bank was right, and must be affirmed.

The *Peck* case was followed in *Union Bank & Trust Co. v. Loble*, 20 F.2d 124, 126 (9 Cir.), *cert. denied*, 275 U.S. 545, 48 S.Ct. 83, 72 L.Ed. 417 (1927). There a bank advised a debtor corporation in Montana to make a special sale of merchandise "for the purpose of paying demands of Eastern creditors, and facilitating the conduct of the bankrupt business, in the expectation of reorganizing the same under an arrangement whereby relatives to whom the bankrupt was indebted were expected to take stock therein." As we learn from Judge Pope's dissent in the *Dudley* case discussed below, nothing was on deposit with the bank when the special sales were begun. On an appeal by the bank from an order denying the right to set off its claim against the amount representing proceeds of the special sale that had been deposited with it, the court, after rejecting the argument that allowing setoff would sanction a preferential transfer, nevertheless sustained the ruling below, saying:

> While the money realized on the special sale and deposited to the bankrupt's current account and subject to its check for general purposes may not be said to come within the accepted definition of a special deposit so as to be exempt from the bank's claim to the right of set-off, [we are inclined to the view that] the circumstances under which the fund was created, and the cooperation of the bank and the bankrupt in its creation, were sufficient to so far impress upon it the charac-

ter of a trust fund that the bank should be held estopped to assert a lien thereon or the right of set-off.

In *First Nat'l Bank of Portland v. Dudley, supra*, 231 F.2d 396, on which the bankruptcy judge and the district court heavily relied, the Ninth Circuit divided with respect to the scope of its earlier decision in *Loble*. In *Dudley* a debtor worked out a plan with a bank and other creditors whereby it would liquidate its inventory and pay off its debt at the rate of 10% per month. The proceeds of the sale were deposited in the debtor's regular account at the bank. When the debtor filed for bankruptcy, the bank offset the small balance on deposit against its claim. The majority denied the setoff on the authority of *Loble*. Judge Pope vigorously dissented, 231 F.2d 403–04. He distinguished *Loble* on various bases, the ones most pertinent here being that at the time of the sale in *Dudley* there were already funds on deposit at the bank, that before the setoff these deposits were depleted rather than increased, and that the sales were in ordinary course and not earmarked for any special purpose. He also favored a narrow reading of *Loble* on policy grounds, which are pressed by appellant here: [16]

> The type of arrangement here attempted was designed to accomplish a useful object,—to get a faltering business on its feet, all to the end that ultimately all creditors may be paid, and the owner save his business. True, the attempt failed, but it was worth the try. Such attempts, I think, should be encouraged. But from now on no bank, creditor of such a debtor, will dare to agree to "go along", on such a plan, because if it should fail, and bankruptcy follow, as here, the bank would risk being held to have waived its right to set-off. That is the principal reason why I think the rule of the *Loble* case should not be extended to this case where the facts are so different.

16. Judge Pope further noted that in the leading case of *Citizens Nat'l Bank of Gastonia v. Lineberger*, 45 F.2d 522, 530 (4 Cir. 1930), Judge Parker had given a narrow reading to *Loble*, as had also been done in *Killoren v. First Nat'l Bank in St. Louis*, 127 F.2d 537, 543 (8 Cir. 1942).

In light of all this we do not regard *Dudley* as such a towering authority as did the bankruptcy judge and the district court.

■ The precise holding of *Dudley* was that "the bank, the bankrupt and the trade creditors joined in an agreement to commit the proceeds from liquidation of the bankrupt's inventory toward payment of all claims on an equal and ratable basis," 231 F.2d at 402, and that implicit in that agreement was a waiver of the right of setoff. No such agreement can be made out here. The fact that the 1970 Agreement consolidated the debts owed to NJNB and other creditors into two notes to be held by NJNB does not constitute proof that NJNB agreed not to exercise its right of setoff in a manner that would increase its share at the expense of the other banks and the lessors. Neither does ALC's agreement, with the consent of the other parties, to use NJNB as sole depository evidence any such intent; indeed, it affords some basis for a contrary inference. The other parties to the 1970 and 1971 agreements were highly sophisticated extenders of credit; if their intention was that NJNB, the lead bank, should not use its right of set-off to their detriment, it would have been simple to say so. We do not agree with the majority in *Dudley* that the bank had expressly to reserve its right of setoff. That right was preserved by law, and it stood absent an agreement to waive

it. Neither do we think it significant that NJNB "monitored both the account and ALC's affairs" through the position of its representative on ALC's board of directors. The extent of the bank's monitoring of ALC's checking account is insubstantial, see note 7 *supra*, and the presence of Lynch on the board of directors, on which the lessors commanded a majority, hardly suggests an intent to forego the right of setoff.[17] In sum, we hold that whatever the implications of the *Dudley* case, the findings below that "NJNB played a major role in formulating the two refinancing agreements" and in closely monitoring the financial status of ALC are insufficient as a matter of law to justify the conclusion that the bank agreed to hold the funds on deposit for payment to other creditors and not to set them off against its own claim.

■ What seems to have tipped the scales with the bankruptcy judge and the district court to lead them to find that there was such an agreement and that the NJNB was consequently estopped from setting off the funds was their determination that other creditors had relied on NJNB's assurances that it would not exercise its setoff rights. The only evidence on this was an interrogation of Mr. Lynch by counsel for the debtor which we quote in the margin.[18] While the record does not tell us

---

17. It may be argued that the 1971 Agreement evidenced such an intent by providing in detail for a special account which would be used for the payment of creditors. However, by authorization of the ALC board of directors on August 29, 1972, no special account was opened, see p. 2790 *supra*, and ALC continued to make deposits in the general account at NJNB which it had long maintained.

We fail to see how the presence of Lynch at the meeting at which the special account was dispensed with is particularly probative, though the bankruptcy judge apparently thought otherwise. In any event, it would have been quite simple for the other lenders and the lessors in the 27 months between the board's action and the setoffs to ask NJNB to stipulate that permission to ALC to pretermit the opening of a special account should entail NJNB's foregoing a right of setoff on the general account; whether NJNB would have agreed to this, we will never know.

Further, nothing in the agreement touched the question of NJNB's right of setoff with respect to monies not required to be deposited in the special account. The bankruptcy judge and the district court found that the CD's, which including interest constituted all but $1,682.98 of the deposits set off, represented the "working capital" required to be raised by ALC under the 1971 agreement. These funds clearly were not intended for the coffers of the other parties to the agreement, but rather for operation of the business.

18. Q. You were ready to clarify the subject of set-off. You were stopped.
Is there anything that you want to—
A. I think there was a discussion. It is a little fuzzy. I think the concern evidenced by some of the other creditors was that the additional capital would be deposited in the bank.
The capital that was required under the agreement and the day after it was deposited would be set off.

with whom or precisely when the conversation occurred, it was evidently with some participants to the refinancing agreements. We fail to see how Lynch's correct statement that NJNB could not set off unless it had a matured note could be taken to mean that NJNB would not set off even if it could; indeed it can much more reasonably be taken to indicate just the opposite. As stated before, the other parties to the agreements were not babes in the woods but highly sophisticated extenders of credit, who would not have relied on such flimsy assurances from NJNB if they had indeed intended to protect themselves against the bank's right of setoff. The record likewise does not support the finding of the bankruptcy judge that other creditors "changed their position to their detriment" because of the statement.

■ On this issue, as on others, we find it highly significant that no representative of any other bank or of any other party to the agreements was called to testify as to the understanding between them and NJNB with respect to the latter's right of setoff. The absence of any such testimony justifies a strong inference that there was no such understanding and certainly that there was no reliance upon it. This is not the case of the ordinary witness equally available to both sides whose nonproduction supports an inference adverse to either, see *United States v. Dibrizzi*, 393 F.2d 642, 646 (2 Cir. 1968), and cases there cited. The other parties to the 1970 and 1971 agreements are the real parties in interest in this litigation between the Trustees and NJNB since, as we were told, all employees and trade creditors have largely been paid, and their failure to testify thus carries special weight against the Trustee who is mainly asserting their interests. See *United States v. Beekman*, 155 F.2d 580, 584 (2 Cir. 1946); *N. Sims Organ & Co. v. SEC*, 293 F.2d 78, 80–81 (2 Cir. 1961), *cert. denied*, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962).

I told them that if the agreement was put together and signed and we didn't have a past due note at that time, we had no way to set off. So whether we wanted to or not we couldn't.

While we are well aware of the deference to be afforded to concurrent findings of fact of a bankruptcy judge and a district court, the cases according such deference have not purported to extend it to findings that are clearly erroneous. See *In re Ira Haupt & Co.*, 379 F.2d 884, 892 (2 Cir. 1967); *In re Ira Haupt & Co.*, 424 F.2d 722, 723 (2 Cir. 1970).

■ We would thus be constrained to set aside the findings concerning Lynch's statement, see *Schapiro v. Tweedie Footwear Corp.*, 131 F.2d 876 (3 Cir. 1942); *In re Banque de Financement, S.A.*, 568 F.2d 911, 917 (2 Cir. 1977), were the issue not ultimately resolved by the basic difference in approach between us and the courts below. Our opinion that it is not appropriate to be guided primarily by the principle of equality among creditors when dealing with the setoff provision of the Bankruptcy Act, and our conclusion that Judge Pope's dissent in *Dudley* accurately described some of the policies that underlay that provision lead us to be more circumspect than the judges below or the majority in *Dudley* in carving out exceptions to the express language of § 68 a. We therefore will require far more convincing evidence than was presented here to find that the trustee has borne his burden of proving that an account was special rather than general and that a bank is estopped from asserting its setoff rights. Cf. *First National Bank of Clinton v. Julian, supra*, 383 F.2d at 338.[19]

The trustee argues alternatively that NJNB had no right of set-off because the deposits were not made in the regular course of business and were not withdrawable at the will of the depositor. This raises the question whether this often used language is a judicial gloss imposed on § 68 a regardless of the time when the deposits were made or is simply an affirmation that § 68 a cannot be used to validate what would otherwise be a preference voidable under §§ 60 a and b.

19. In view of our holding on this issue, the question whether the pleadings adequately apprised NJNB of an intention to rely on a theory of estoppel becomes moot.

■ The latter conclusion is dictated both by reason and by authority as recent as this court's decision in *Katz v. First National Bank of Glen Head*, 568 F.2d 964 (1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978), in which the inquiry whether deposits had been made in the ordinary course of business was undertaken to determine if preferential transfers had occurred. As recognized in *New York County Bank v. Massey, supra*, 192 U.S. at 145–47, 24 S.Ct. 199, and the many court of appeals decisions cited in *Katz*, a deposit in an unrestricted checking account is not a "transfer" even under the broad definition of § 1(30) of the Bankruptcy Act and hence cannot constitute a preference under § 60 a.[20] The point was perhaps best put by Judge Parker in *Citizens' Nat'l Bank of Gastonia v. Lineberger, supra*, 45 F.2d at 526–27, when he said:

> [A deposit in a bank] does not deplete the estate of the depositor, but results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked against . . . . .
> A deposit of funds differs from a payment in the essential particular that it is withdrawable at the will of the depositor.

■ On the other hand, when either the depositor or the bank intends that a particular deposit may not be withdrawn but must be used to satisfy the bank's claim, the deposit does "deplete the estate of the depositor" and constitutes a voidable preference *if the other requirements of § 60 a are met.* These include the requirement that the transfer be made within four months before the filing of the petition, see note 20 *supra.* The reason that many of the cases denying setoff of nonwithdrawable deposits do not discuss the four-months requirement of § 60 a(1) is not because it does not apply but because it was so clearly satisfied. See, e. g., *Merrimack Nat'l Bank v. Bailey*, 289 F.2d 468, 470 (1 Cir.), *cert. denied*, 263 U.S. 704, 44 S.Ct. 33, 68 L.Ed. 515 (1923) (requirement mentioned); *Goldstein v. Franklin Square Nat'l Bank*, 107 F.2d 393 (2 Cir. 1939) (requirement mentioned); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 834 (5 Cir. 1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960) (requirement mentioned); *Farmers Bank of Clinton v. Julian*, 383 F.2d 314 (8 Cir.), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593 (1967) (requirement met); *Katz, supra*, 568 F.2d at 969 (assumes trustee could prove elements necessary to show existence of preference apart from requirement that there has been a transfer). See also *In re Scheer Lighting Studios, Inc.*, 40 F.2d 955 (E.D.N.Y.), *aff'd, Arnold v. Globe Exchange Bank*, 45 F.2d 1010 (2 Cir. 1930); *New York Credit Men's Ass'n, Inc. v. Domestic Broadtail Producers, Inc.*, 61 F.Supp. 102 (S.D.N.Y.1945).

Since the record contains no evidence as to how much of the setoffs represent deposits made within four months of the filing of

---

**20.** Section 60 a(1) of the Bankruptcy Act provides:

> A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

Section 60 b authorizes a trustee in bankruptcy to avoid a preference "if the creditor receiving it or to be benefited thereby . . . has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."

The term transfer as defined in § 1(30) includes:

> the sale and every other and different mode, direct and indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor . . . . .

the petition,[21] we could rest decision on that ground. However, we believe that apart from this, the trustee did not make a sufficient showing to bring himself within the exception recognized in *Katz.* The provision in the September 2, 1970 agreement that ALC should conduct all banking operations at and through NJNB did not cause deposits to constitute a depletion of the estate. Apart from other purposes of such a requirement, notably that NJNB should be able to profit from use of ALC's balances as a basis for making investments or loans, the intention was not that the deposits should be used as payment on the debt, which had been deferred with every expectation of payment. Rather the intention may well have been that if and when a day of reckoning should come, whatever was then left in the account would be available for set off by NJNB. This does not fit the description that a deposit will be a preferential transfer if "either the [depositor] or the Bank, *at the time of the deposit,* intended them to operate as a payment of the notes." *Cusick v. Second Nat'l Bank,* 73 App.D.C. 16, 17–18, 115 F.2d 150, 151–52 (1940) (emphasis supplied), which we quoted with approval in *Katz,* 568 F.2d at 971 n. 8. See also *Goldstein v. Franklin Square Nat'l Bank, supra,* 107 F.2d at 394 (deposits accepted "with intent to apply them on a pre-existing claim against the depositor rather than to hold them subject to the depositor's checks in ordinary course are given their intended effect when so applied . . . they are payments on account of debt."); *Joseph F. Hughes & Co. v. Machen,* 164 F.2d 983, 987–88 (4 Cir. 1947), *cert. denied,* 333 U.S. 881, 68 S.Ct. 912, 92 L.Ed. 1156 (1948) (deliberate building up of an account for the purpose of enabling the bank to obtain a preference or acceptance of deposit with "intent of applying it to the depositor's obligations rather than subjecting it to his power of withdrawal" will invalidate setoff.). Again, quite apart from the remoteness in time, we see no sufficient evidence that the monitoring of ALC's account after the September 15, 1971 agreement and prior to June, 1974 caused deposits into the account to constitute preferential transfers. ALC drew checks freely on the account. The record discloses only two or three occasions on which NJNB raised questions. All involved payments to the same party, and on each occasion NJNB honored the checks when satisfied they were for proper business purposes. Also, as previously pointed out, see note 6 *supra,* the testimony as to NJNB's refusal to allow ALC's moneys to be invested in CD's of other banks was conflicting. Since the conflict was never resolved, we cannot take Mobach's testimony as meeting the Trustee's burden of proof. It follows that when NJNB accelerated its loan on July 3, 1974, it was entitled to exercise its right of setoff.

We do not see why NJNB's position should be worse because it agreed to withhold the setoff temporarily if ALC would

21. While the record is not informative as regards deposits in ALC's checking account, it does indicate that the last rollover of a $100,000 certificate of deposit occurred on November 8, 1974, about 19 days before the four-month period began. Sixty thousand dollars of a certificate of deposit was rolled over on December 30, 1975, but this had already been assigned to NJNB, on November 1, 1974, as security for the letter of credit issued in the New Jersey tax matter.

We do not think § 60 a(2) of the Bankruptcy Act relevant here. That subsection provides that a transfer shall be deemed to have been made at the time "when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could have become superior to the rights of the transferee." Any transfer not so perfected prior to the filing of a petition in bankruptcy is deemed to have occurred immediately prior to the filing. This provision was not meant to apply to setoffs, but rather was designed to strike down secret liens. See 3 Collier, *supra* ¶ 60.38; Weinstein, The Bankruptcy Law of 1938 at 120 (1938); McLaughlin, Defining a Preference in Bankruptcy, 60 Harv.L.Rev. 233 (1946). Since it may be that under New Jersey law the right of setoff cannot be superior to a lien on the deposit, see *Associates Discount Corp. v. Fidelity Union Trust Co.,* 111 N.J.Super. 353, 268 A.2d 330 (1970); *Morrison Steel Co. v. Gurtman,* 113 N.J.Super. 474, 274 A.2d 306, 311–12 (App.Div. 1971), to hold this provision applicable would render the four-month provision nugatory when applied to bank setoffs, a result we cannot conceive was intended.

maintain its existing balance, and thereafter examined each check to make certain that it was being used for operating purposes and not as a means of siphoning money out of the account into other banks or for payment to other creditors. If the deposits that had been made prior to July, 1974 were not transfers, they did not become so simply because NJNB would not allow an existing right of set off to be destroyed. There is no evidence of any build-up of the account between July 1974 and the filing of the Chapter XI petition on March 27, 1975. The amount invested in certificates of deposit, which represented the bulk of the account, remained unchanged until diminished by the assignment and setoffs. If NJNB had exercised its right of set off in July 1974, ALC had filed its Chapter XI petition then, and NJNB had reloaned the amount it had set off with the approval of the bankruptcy court, as appears to be common practice, see H.R.Rep. No.95–595, *supra* at 184, the new loan would have been entitled to priority as an administrative claim. It can, of course, be argued as Professor McLaughlin did in 1927 and 1937, see Amendment of the Bankruptcy Act, 40 Harv.L.Rev. 583, 602–03 (1927); Aspects of the Chandler Bill to Amend the Bankruptcy Act, 4 U.Ch.L.Rev. 369, 400–01 (1937), that keeping alive a company as sick as ALC was in the summer of 1974 does more harm than good but Congress evidently was not of that mind, see 4 Collier, *supra* ¶ 68.01 at 844–48. See also *Studley v. Boylston Nat'l Bank, supra,* 229 U.S. at 529, 33 S.Ct. 806, and Judge Pope's dissent in *First Nat'l Bank of Portland v. Dudley, supra,* 231 F.2d at 404.

■ It follows that the NJNB was entitled to setoff the balance in ALC's account (including the certificates of deposit) against the latter's indebtedness to it. The remaining question is whether the balance should be first applied to the payment of NJNB's secured note. The bankruptcy judge held that if the setoff was valid, it must be so applied because of a provision of the September 15, 1971 agreement discussed below. In view of his holding that the setoffs were invalid, and the district

court's affirmance, this ruling lost practical importance. Our reversal of that holding requires us to deal with the problem.

The bankruptcy judge relied on paragraph 8 of the 1971 agreement. This provided that certain portions of ALC's cash flow should be paid into the special account discussed above and that "Category 1" claims set forth in an annexed schedule "shall be paid prior to payment of any other Category." Category 1 claims consisted of an amount of "Remaining Rent" due to lessors, "a portion of ALC's indebtedness to Bryant (apparently $120,000), and "a portion of the Guaranteed Bank Loan" (apparently the $100,000 owed on NJNB's secured note).

The bankruptcy judge overread this provision. It does not deal generally with how creditors must apply monies that came into their hands but only with the order of application of the specified cash flow. Whether NJNB was bound to apply the setoff to the secured note or could apply it to the unsecured debt, as was manifestly to its advantage, was left to general law.

As we read the general law, NJNB was within its rights in applying the funds on deposit to its unsecured loan first. Section 387 of the Restatement of Contracts states the applicable rule:

Where more than one matured contractual duty is owed to the same person and these duties are for performances of identical character, such as the payment of money, a payment or other performance capable of discharging in whole or in part either one or another of these duties, is applied, subject to the rules stated in §§ 388–393,

(a) as the debtor, at or before the time of payment or performance, manifests to the creditor an intention to have it applied; or,

(b) if the debtor makes no such manifestation, as the creditor within a reasonable time manifests an intention to have it applied; or,

(c) if neither the debtor nor creditor makes a seasonable manifestation of

intention, as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied.

ALC, as we have held, did not manifest an intention as to how the funds were to be applied. In such a situation, Professor Williston noted, the "creditor is allowed to make the appropriation in the way most advantageous for himself without regard to the interests of the debtor. Thus, the payment may be applied to an unsecured debt . . . ." 15 Williston, Contracts § 1796 (3d ed. 1972); see *Hickey v. First Nat'l Bank of Lyndhurst,* 110 N.J.Eq. 52, 158 A. 377 (N.J.Ct. Errors & App.1932); *Borough of Totowa v. American Surety Co. of New York,* 39 N.J. 332, 188 A.2d 586, 590 (1963); *General Electric Co. v. E. Fred Sulzer & Co.,* 86 N.J.Super. 520, 207 A.2d 346, 362 (1965), *aff'd,* 92 N.J.Super. 210, 222 A.2d 655 (App.Div.), *cert. denied,* 48 N.J. 350, 225 A.2d 362 (1966); *St. Paul Fire and Marine Insurance Co. v. United States,* 309 F.2d 22, 24–25 (8 Cir. 1962), *cert. denied,* 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963) (Blackmun, J.). There is no question that the bank applied the funds to its unsecured loan.

We therefore find that the setoffs were valid and that NJNB is entitled to apply the full amounts set off, $275,337.54, against its unsecured debt, leaving it with a general unsecured claim for the deficiency. NJNB is also entitled to judgment for the amount owed on the $100,000 loan. Any deficiency between this amount and the $40,000 in proceeds from the sale of the security under the loan the bank will constitute an unsecured claim. Since there is no evidence of the amount of interest presently owed on the unsecured claim or on the $100,000 loan, we must remand to the bankruptcy court for the limited purpose of determining the amount of the deficiency.

The judgment is reversed and the cause remanded to the district court with instructions to remand to the bankruptcy judge with directions to proceed in accordance with this opinion. No costs.